**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Civil Action No:** |
| **v.** | **Jury Trial Demanded** |
| **DEAN PATRICK MCDERMOTT and MCDERMOTT INVESTMENT ADVISORS, LLC,** | |
| **Defendants, and** | |
| **MCDERMOTT INVESTMENT SERVICES, LLC,** | |
| **Relief Defendant.** | |

---

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows against Defendants Dean Patrick McDermott ("McDermott") and McDermott Investment Advisors, LLC ("MIA") (collectively, "Defendants"), and Relief Defendant McDermott Investment Services, LLC ("MIS"):

## SUMMARY OF THE ACTION

1.      Between March 2013 and December 2014, McDermott and MIA, the investment adviser he owns, unlawfully invested their clients in a version of a security that charged significant transactional sales charges when the identical security without these costs was available.

2.      As investment advisers, Defendants were paid a fee by their clients to choose investments and make trades on their clients' behalf.  Under applicable law, and as detailed in MIA's then-operative Compliance Policies and Procedures Manual, Defendants were "require[d] to act in the best interests of their clients and place their interests before [their] own."  By

causing their clients to pay these avoidable fees, Defendants violated their fiduciary duty to seek best execution of these transactions on behalf of their clients.

3.  Defendants also violated their fiduciary duty by failing to disclose to their clients the conflict of interest inherent in these transactions:  namely, that a version of the securities without the transactional sales charges was available, and that the majority of the unnecessary transactional costs incurred by Defendants' clients was paid to Relief Defendant MIS, McDermott's 100%-owned and controlled broker-dealer.  McDermott, MIA, and MIS were double dipping by receiving both the advisory fees and the fees generated by the more expensive securities.

4.  By failing to seek best execution of the trades and failing to disclose the conflicts of interest inherent in these transactions, Defendants and Relief Defendant enriched themselves at the expense of their clients and without their clients' knowledge.

5.  As a result of the conduct described in this Complaint, Defendants violated, and unless enjoined will continue to violate, Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and (2)].  Alternatively, with respect to Defendant McDermott, McDermott is liable under Sections 209(d) and (f) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and (f)] for aiding and abetting MIA's violations of Section 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].  Furthermore, Relief Defendant MIS has been unjustly enriched as a result of the fact that it received the majority of the avoidable fees that Defendants' clients paid as a result of the fraud, to which it has no legitimate claim.

## JURISDICTION AND VENUE

6.  The Commission brings this action pursuant to Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and (e)] to enjoin such transactions, acts, practices, or

courses of business and to obtain disgorgement of all ill-gotten gains, prejudgment interest, and civil penalties.  The Commission further seeks any other relief as the Court may deem just and appropriate pursuant to Section 21(d)(5) of the Securities Exchange Act of 1934 [15 U.S.C. § 78u(d)(5)].

7.      This Court has jurisdiction over this action pursuant to Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), and 80b-14].

8.      Venue in this District is proper pursuant to Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Among other things, certain of the acts or practices constituting the violations of the federal securities laws alleged herein occurred within the Eastern District of Pennsylvania, and because, at all relevant times, McDermott and MIS were residents of Pennsylvania, and McDermott, MIA, and MIS transacted business in the Eastern District of Pennsylvania.

## THE DEFENDANTS

9.      **McDermott**, age 59, resides in Pennsylvania and Florida.  At all relevant times, McDermott was the principal and sole owner of both MIA and MIS.  He served as the Managing Member and Chief Compliance Officer for MIA and the Managing Member of MIS.  In January 1998, McDermott settled with the Commission, agreeing to the Commission's issuance of an order requiring that McDermott cease and desist violations of Sections 17(a)(2) and (3) of the Securities Act of 1933 arising out of his failure to conduct due diligence before selling investments that turned out to be a Ponzi scheme engineered by his prior employer.  Securities Act Rel. No. 7502 (January 30, 1998).

10.     **MIA** is a limited liability company that was organized in 2004 under the laws of the State of Florida.  Its principal place of business is in Fort Myers, Florida, and it has various other offices in Pennsylvania, Florida, New Jersey, and Maine.  MIA has been a registered

investment adviser with the Commission from approximately September 2006 to September 2012, and from April 2014 to present, and with the State of Florida from approximately September 2012 to April 2014.  During the relevant period, MIA advised between 100 and approximately 350 clients, consisting mostly of individuals.  From about approximately 2012 to 2015, MIA's assets under management ranged from approximately $50 million to approximately $165 million.

### RELIEF DEFENDANT

11.     **MIS** is a limited liability company that was organized in 2010 under the laws of the Commonwealth of Pennsylvania and has been a registered broker-dealer since 2011.  Its principal place of business is in Bethlehem, Pennsylvania, and it has various branch offices in Florida, California, New Jersey, Maine, Nebraska, Pennsylvania, Illinois, and Oregon.

### FACTS

### McDermott's Control of MIA and MIS

12.     As 100% owner of MIA and MIS, McDermott had full control of both entities and supervised the companies' various offices around the country.  There was significant commonality and overlap between MIA and MIS, as most of the individuals who worked for McDermott were both investment advisers for MIA and registered representatives for MIS. Additionally, the two firms shared at least five different office locations, including their respective main offices.

### MIA's Advisory Services

13.     Although Defendants provided a number of different advisory services, McDermott and MIA regularly made and executed investment decisions on behalf of their advisory clients without prior notification or approval.  Although each of the advisory accounts

4

was staffed with an MIA representative (at times McDermott himself, but in other cases another MIA adviser), McDermott frequently made the investment decisions, which were then applied across accounts.

14.    MIA's advisory clients paid MIA an advisory fee based on a percentage of assets under management.  The advisory fee was paid each quarter and was determined by applying the account value on the first day of the quarter to a standard calculation.  During the relevant time period, the standard fee scale ranged from 1% to 2% annually based on the size of the account, although the fee could be negotiated to a lower amount.

15.    As investment advisers, and as detailed in MIA's then-operative Compliance Policies and Procedures Manual (the "Compliance Manual"), Defendants were "require[d] to act in the best interests of their clients and place their interests before [their] own."  Defendants were also required to make full and fair disclosure of all material facts to their clients and had an "obligation to obtain best execution for [their] client transactions."  Defendants also stated in the Compliance Manual that:  "[MIA] conducts its business with high ethical and professional standards consistent with applicable statutes, rules and regulations. In so doing, [MIA] recognizes its fiduciary duty to its clients and strives to conduct its business with the highest integrity."

**The Unit Investment Trusts**

16.    Among other investment products, McDermott and MIA invested in unit investment trusts ("UITs") on behalf of their advisory clients.  A UIT is an investment product where the creator, or "sponsor," chooses securities and deposits them into a trust for a pre-determined period of time, at the end of which the trust terminates.

17.    The UITs were available in two versions:  (1) a fee-based version, made available

to advisory clients who were paying a periodic advisory fee, and (2) a standard version for retail broker-dealer clients who were not in an advisory program and paid for services on a transaction-by-transaction basis.

18.     Investors who purchased the more expensive, standard version of the UITs incurred two different charges.  First, investors were charged a 0.50% "creation and development fee," which was paid to the UIT sponsor.  Second, investors were charged a much more significant "transactional sales charge," the majority of which (approximately 90%) was ultimately paid to the broker-dealer making the trade, with the remainder being retained by the sponsor.

19.     However, investors working through an investment adviser and paying a periodic advisory fee had the ability to purchase a fee-based version of the UITs that charged substantially less.  In the fee-based version, the transactional sales charges of 2.45% or 3.45% were waived, and advisory clients only were required to pay the 0.50% creation and development fee to the UIT sponsor.

### Defendants Invested Advisory Clients in Standard UITs

20.     Between March of 2013 and December of 2014, Defendants purchased, in approximately 169 advisory accounts, a total of 558,975 units of standard UITs for $5,726,969.95 in total principal value.  In most cases, Defendants purchased the same UIT for several advisory clients on the same day.  In a few instances, Defendants purchased the same UIT for more than 60 clients on the same day.

21.     McDermott ensured that the standard, rather than the lower cost fee-based, security identification number, or CUSIP, was entered for each purchase.

22.     McDermott's and MIA's decision to purchase the standard UITs caused MIA's

advisory clients to pay approximately $160,000 in avoidable transactional sales charges. This resulted in a substantial benefit to McDermott and MIS. Of the approximately $160,000 in avoidable transactional sales charges, the UIT sponsors paid McDermott's affiliated broker-dealer MIS $143,379.33 (approximately 90%) for acting as the introducing broker-dealer on the transactions and retained the remaining approximately 10% to cover wholesale services.

23.     As the 100%-owner of both MIA and MIS, McDermott's decision to select the standard UITs on behalf of his advisory clients allowed him to receive not only his MIA advisory fee, but also transactional compensation in his capacity as the principal of MIS—all at the expense of his clients.

**MIA Failed to Seek Best Execution and Failed to Disclose Conflicts of Interest**

24.     Defendants knew or were reckless in not knowing that their fee-paying advisory clients could have purchased the fee-based UITs, which would have avoided the transactional sales charges and therefore offered the most favorable terms reasonably available under the circumstances. Instead, by choosing to invest their clients in the more expensive standard UITs, Defendants violated their fiduciary duty to their clients by failing to seek best execution on those transactions on behalf of their clients.

25.     In addition, prior to engaging in these transactions, McDermott and MIA not only failed to disclose to their advisory clients that there were transactional sales charges associated with the standard UIT investments—and that the majority of those charges would be remitted to MIS as the introducing broker-dealer on the transactions—but Defendants also failed to disclose that a cheaper, fee-based version of the UIT was available to clients. Defendants violated their fiduciary duty to their clients by failing to disclose this conflict of interest, which was a material fact, and by putting their own interests ahead of those of their clients.

26.     McDermott admitted that Defendants' selection of the more expensive, standard UITs was intentional, and was done at the expense of his clients in order to generate revenue for his affiliated broker-dealer.  Defendants could have selected the fee-based UITs, but chose not to do so "[b]ecause MIS has overhead" and, given that McDermott and MIS did not charge advisory clients commission fees for equity transactions, "we ha[d] to make up the revenue someplace."

27.     MIA and McDermott, intentionally, knowingly, or recklessly, concealed that by selecting standard UITs which charged transactional sales charges, instead of the fee-based UITs which had no such charges, McDermott and MIS would profit from the majority of the transactional costs.

### Defendants Violated the Federal Securities Laws

28.     McDermott and MIA are "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)] because, for compensation, they engage in the business of advising others as to the advisability of investing in, purchasing, or selling securities.

29.     MIA is registered with the Commission as an investment adviser, and MIA and McDermott each is in the business of providing investment advice concerning securities for compensation.

30.     McDermott is also an investment adviser due to his ownership, management, and control of MIA.

31.     As investment advisers, Defendants owe a fiduciary duty to their advisory clients.

32.     Among other things, Defendants owe their clients:  (1) a duty to seek best execution for transactions they execute on behalf of their clients; and (2) a duty to disclose all

material facts, including conflicts of interest.

33.     Defendants violated the fiduciary duty they owe to their advisory clients by:  (1) purchasing a version of the UITs that included an avoidable cost in the form of transactional sales charges, thus failing to seek best execution; and (2) failing to disclose to their advisory clients that a cheaper, fee-based alternative of the same UITs was available, and that, when they selected the standard version, McDermott's related broker-dealer, MIS, would obtain the majority of the transactional sales charge needlessly paid by the advisory clients.

34.     In connection with this conduct, Defendants used the mails or any means or instrumentality of interstate commerce.

## TOLLING OF STATUTE OF LIMITATIONS

35.     Defendants McDermott and MIA and Relief Defendant MIS agreed to toll any statute of limitations applicable to the claims alleged herein during the periods from April 30, 2017, through November 1, 2018.

## CLAIMS FOR RELIEF

## FIRST CLAIM

### Violations of Section 206(1)
### (Against Both Defendants)

36.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 35, inclusive, as if they were fully set forth herein.

37.     By engaging in the conduct described above, Defendants McDermott and MIA directly or indirectly, by use of the mails or the means or instrumentalities of interstate commerce, while acting as an investment adviser, knowingly or recklessly employed devices, schemes, or artifices to defraud clients.

38.     By engaging in the foregoing conduct, Defendants McDermott and MIA violated and,

unless restrained and enjoined, will continue to violate, Section 206(1) of the Advisers Act [15 U.S.C. §§ 80b-6(1)].

## SECOND CLAIM

### Violations of Section 206(2)
### (Against Both Defendants)

39.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 35, inclusive, as if they were fully set forth herein.

40.     By engaging in the conduct described above, Defendants McDermott and MIA directly or indirectly, by use of the mails or the means or instrumentalities of interstate commerce, while acting as an investment adviser, knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients.

41.     By engaging in the foregoing conduct, Defendants McDermott and MIA violated and, unless restrained and enjoined, will continue to violate, Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## THIRD CLAIM

### Aiding and Abetting MIA's Violations of Sections 206(1) and 206(2)
### (Against Defendant McDermott)

42.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 41, inclusive, as if they were fully set forth herein.

43.     By engaging in the conduct described above, MIA directly or indirectly violated Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

44.     By ensuring that MIA's advisory clients purchased standard UITs with the additional transactional sales charges, and failing to disclose the conflict of interest inherent in buying a particular investment product on behalf of an advisory client to benefit himself and his company, McDermott knowingly or recklessly substantially assisted MIA's violations of

Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)].

45.     By reason of the foregoing, McDermott aided and abetted MIA's violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)] and, as a consequence, McDermott is liable under Sections 209(d) and (f) of the Advisers Act [15 U.S.C. §§ 80b-9(d) and (f)].

## FOURTH CLAIM

### Claims with Respect to Relief Defendant
### (Against Relief Defendant MIS)

46.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 41, inclusive, as if they were fully set forth herein.

47.     Relief Defendant MIS received payments, to which it does not have any legitimate claim, from the UIT sponsors as a result of the transactional sales charges caused by McDermott's and MIA's violations of Sections 206(1) and 206(2).

48.     Relief Defendant MIS obtained these ill-gotten gains described above as part, and in furtherance, of the securities laws violations alleged above, under circumstances in which it is not just, equitable, or conscionable for it to retain the funds.

49.     By reason of the foregoing, Relief Defendant MIS has been unjustly enriched and must disgorge, jointly and severally with Defendants, the amount of its ill-gotten gains.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants from, directly or indirectly, violating

Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)];

## II.

Ordering Defendants and Relief Defendant MIS to disgorge, jointly and severally, all ill-gotten gains or unjust enrichment derived from the activities set forth in this Complaint, together with prejudgment interest thereon;

## III.

Ordering Defendants to pay civil penalties pursuant to Section 209(e) of the Adviser Act [15 U.S.C. § 80b-9(e)]; and

## IV.

Granting such other and further relief as this Court may determine to be just, equitable, and appropriate.

Dated:  September 13, 2019

Respectfully submitted,

Christopher R. Kelly
Jennifer Chun Barry
Assunta Vivolo
Matthew S. Raalf

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone:  (215) 597-3100