**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | **CIVIL ACTION** |
| Plaintiff, | **NO. 19-4229-KSM** |
| *v.* | |
| **DEAN PATRICK MCDERMOTT**, et al., | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                                                  **March 30, 2022**

Defendant Dean Patrick McDermott owns and operates an investment advisory firm, Defendant McDermott Investment Advisors, LLC ("MIA").  (Doc. No. 57-1 ¶ 1.)  From 2013 through 2014, Defendants placed their clients into certain securities that bore transaction fees even though those clients were eligible to purchase identical securities for no fee.  (*Id.* ¶ 92.)  A portion of the transaction fees paid on those securities went to Relief Defendant McDermott Investment Services, LLC ("MIS"), a broker-dealer wholly owned by McDermott.  (*Id.* ¶ 96.)  The U.S. Securities and Exchange Commission (the "Commission") commenced this enforcement action against Defendants, alleging that their conduct violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940.  (Doc. No. 1.)  Following a period of discovery, the Commission moved for summary judgment.  (Doc. No. 46.)

Presently before the Court are the Commission's Motion to Preclude the Expert Testimony of Robert Valker (Doc. No. 48), Defendants' Motion to Exclude the Reports and Testimony of Plaintiff's Expert Marti P. Murray (Doc. No. 49), and Defendants' Motion to

Exclude the Report and Testimony of Plaintiff's Expert, Dr. Dennis Hamilton (Doc. No. 50).[1] For the reasons below, the Commission's motion to preclude the report and testimony of Mr. Valker is granted, Defendants' motion to preclude the report and testimony of Dr. Hamilton is denied as moot, and Defendants' motion to preclude the report and testimony of Ms. Murray is granted in part and denied in part.

## I.   BACKGROUND

### A.   *Factual Background*

Viewing the evidence in the light most favorable to Defendants, the relevant facts are as follows.

#### 1.   MIA's Business Structure

McDermott is the sole owner and managing member of MIA and MIS.  (Doc. No. 57-1 ¶ 1.)  MIA was a registered investment adviser from September 2006 through September 2012 and has been a registered investment adviser from April 2014 through present.[2]  (*Id.* ¶ 2.)  MIS has been a registered broker dealer since 2011.  (*Id.* ¶ 3.)  As an investment adviser, MIA is regulated by the Commission, and as a broker-dealer, MIS is regulated by the Financial Industry Regulatory Authority.  (Doc. No. 57-2 ¶¶ 2–3.)

MIA provides clients with investment advice in exchange for a fee, typically one to two percent of the client's assets under management.  (Doc. No. 57-1 ¶ 6.)  From 2013 to 2014 (the "Relevant Period"), MIA advised between 100 and 350 clients, most of whom were individual,

---

[1] The Court is contemporaneously issuing an order on the Commission's Motion for Summary Judgment.  (Doc. No. 46.)

[2] MIA was a state-registered investment adviser during the period from September 2012 through April 2014.  (Doc. No. 57-1 ¶ 63.)  Although state-registered investment advisers are "not required to comply with all aspects of the Investment Advisers Act of 1940" (*id.*), Defendants do not contend that they are not liable for the claims alleged simply because MIA was state-registered during a portion of the relevant period.

retail investors.  (*Id.* ¶ 2.)  And from 2012 to 2015, MIA had between $50 million and $165 million in assets under management.  (*Id.*)  MIA offers two types of client relationships: discretionary and non-discretionary.  (Doc. No. 57-1 ¶¶ 8, 81.)  For discretionary clients, MIA is permitted to make investment decisions without client approval (*id.* ¶ 8), but MIA is not permitted to make investment decisions for non-discretionary clients without notifying them of the proposed decision and receiving their approval (*id.* ¶ 81).

During the Relevant Period, in addition to his role as MIA's sole owner and managing member, McDermott also served as MIA's Chief Compliance Officer.  (*Id.* ¶ 1.)  McDermott and MIA understood that they owed their clients a fiduciary duty to act in their best interest, seek best execution of their transactions, and disclose all actual or potential conflicts of interest.  (*Id.* ¶¶ 27, 32, 38, 47.)  MIA has a Compliance Manual, which reflects this understanding and "recognizes [MIA's] fiduciary duty to its clients."  (*Id.* ¶ 50.)  MIA's Advisory Agreement includes a section on best execution, which explains that "cost is not the sole factor considered in determining best execution."  (Doc. No. 57-2 ¶ 39.)  MIA's ADV Brochure[3] includes a similar section and explains that clients "should review all the fees charged by mutual funds, exchange traded funds, our firm, and others" "[t]o fully understand the total cost [they] will incur."  (*Id.* ¶¶ 40–42.)

## 2.    MIA's UIT Transactions

During the Relevant Period, MIA purchased Unit Investment Trusts ("UITs") on behalf of 166 of its discretionary clients.[4]  (*Id.* ¶ 11.)  A UIT is a portfolio of securities that terminates

---

[3] Forms ADV are the forms investment advisers use to disclose conflicts of interest.  (Doc. No. 57-1 ¶ 115.)

[4] MIA did not purchase UITs for any of its non-discretionary clients, (Doc. No. 57-1 ¶ 81), and McDermott does not recall whether he ever recommended that any of his non-discretionary clients

after a definitive period of time, typically 15 or 24 months.  (Doc. No. 49-2 ¶ 78.)  Investors

purchase "units" of UITs through one-time public offerings.  (*Id.*)  UITs are similar to mutual

funds; however, unlike mutual funds, UITs are not managed, and the portfolio of securities

comprising the UIT is static—it does not change once it is set.  (*Id.* ¶ 79.)

The UITs MIA purchased for its clients were available in standard and fee-based

versions.  (Doc. No. 57-1 ¶ 88.)  The two versions of UITs are essentially the same, and they are

composed of the same portfolio of securities.  (*Id.* ¶ 89.)  The only material difference between

the standard and fee-based versions is the fee structure.[5]  (*Id.* ¶ 90.)  When purchasing standard

UITs, investors incur a transactional sales charge, but there are no transactional sales charges

associated with fee-based UITs.  (*Id.* ¶¶ 93–94.)

MIA's clients were eligible for the lower-cost, fee-based version of UITs, but MIA

always purchased the standard version for its clients, and it always purchased the UITs from

MIS, the broker-dealer wholly owned by McDermott.  (*Id.* ¶¶ 91–92, 98.)  Throughout the

Relevant Period, MIA caused its clients to incur nearly $160,000 in transactional sales charges

by purchasing standard, rather than fee-based, UITs.  (*Id.* ¶ 96.)  MIS earned $143,000 in

revenue from the transactional sales charges on the UITs that MIA purchased on behalf of its

discretionary clients.  (*Id.* ¶ 98.)

Although MIA's clients were saddled with transactional sales charges (allowing MIS to

indirectly profit), McDermott believed this arrangement was "part of a comprehensive, inter-

related fee structure" and was in his clients' best interest.  (Doc. No. 57-2 ¶ 26.)  Under an

---

purchase UITs (*id.* ¶ 82).

[5] During his deposition, McDermott testified that standard and fee-based UITs are different "[e]conomically speaking" in ways other than the fee structure, but he did not elaborate on those economic differences.  (Doc. No. 57-3 at 330.)

agreement between MIA and MIS, if MIA purchased standard version UITs, MIS would provide cost-free equity trades to MIA's clients.  (*Id.* ¶¶ 20–21.)  But if MIA purchased the lower-cost, fee-based version, MIS would not have offered cost-free equity trades, and MIA's clients may have incurred more charges on the whole.  (*Id.* ¶ 23.)  McDermott has admitted that the transaction sales charges are how MIS "derive[s] their income to pay the overhead."  (Doc. No. 47-3 ¶ 4.)  In fact, the revenue MIS earned on these charges exceeded MIS's net profit in the year 2013 ($115,981) and more than doubled MIS's net profit in 2014 ($66,376).  (Doc. No. 57-1 ¶ 103.)

MIA did not notify its clients that it was purchasing (and incurring transaction sales charges) on standard UITs from MIS.  (*Id.* ¶ 119.)  Nor did MIA notify its clients that it could have purchased lower-cost, fee-based UITs instead.  (*Id.* ¶ 119.)  MIA's clients did, however, receive a prospectus from MIS's clearing firm in connection with each UIT purchased on their behalf.  (*Id.* ¶ 113.)  The prospectuses disclosed that MIA had purchased standard UITs on the client's behalf (and thus incurred a transaction sales charge) and that MIA could have purchased fee-based UITs (and thus not incurred a transaction sales charge), but they did not disclose that MIS received a portion of the transaction sales charge.  (*Id.* ¶¶ 133, 141.)  The prospectuses were written by the UIT's sponsors, so they were not specific to MIA's clients, and they were only delivered to a client *after* MIA had purchased a UIT on their behalf.  (*Id.* ¶¶ 139, 140.)  MIA's clients also received transaction confirmation statements after MIA purchased a UIT on their behalf.  (*Id.* ¶ 144.)  These statements indicated that MIA had purchased a standard version UIT but did not list any fees associated with the transaction; however, the statements indicated that the prospectus, which would be provided by mail, listed the fees.  (*Id.* ¶ 144.)

### 3.     MIA's Discussions Regarding UIT Transactions

During the Relevant Period, MIA engaged Ara Jabrayan of RIA Compliance Group ("RIA") as its outside compliance consultant.  (*Id.* ¶ 151.)  RIA reviewed MIA's Compliance Manual and regularly provided risk alerts and updates on actions involving the Commission or other regulators.  (*Id.* ¶¶ 153, 155.)  In October 2013, Jabrayan sent an RIA alert discussing a case "in which an investment adviser was found to have violated its duty to seek best execution by purchasing higher-cost mutual fund share classes when lower-cost share classes were available to clients."  (*Id.* ¶¶ 156–57.)  In the alert, Jabrayan explained that "[advisers] must carefully analyze whether their clients are receiving the most beneficial terms that are reasonably available for their order, especially if those transactions are executed through affiliated broker-dealers."  (*Id.* ¶ 160.)

In December 2013, Mark Fowler, an Examiner for the Commission, met with McDermott regarding MIA's UIT transactions.  (*Id.* ¶ 163.)  Fowler and McDermott discussed MIA's practice of purchasing standard UITs rather than fee-based UITs, and Fowler informed McDermott about a recent enforcement action, *In re Sarkauskas & Associates, Inc.*, Advisers Act Release No. 3669, 2013 WL 4883131 (Sept. 13, 2013).  (*Id.* ¶ 165.)  In *Sarkauskas*, the Commission "found that the investment adviser . . . breached its fiduciary duties . . . by putting its clients in a version of UITs paying a transactional sales charge when a lower-cost share class was available to clients."  (*Id.* ¶ 166.)  Fowler and McDermott discussed differences in the facts of *Sarkauskas* and MIA's UIT transactions.  (Doc. No. 57-2 ¶ 66.)  Fowler sent a closing letter following his examination, which made no mention of MIA's UIT transactions.  (*Id.* ¶¶ 72, 74.)

McDermott never discussed MIA's UIT transaction practices with Jabrayan or counsel. (Doc. No. 57-1 ¶ 171.)

B.     **Procedural History**

The Commission commenced action against Defendants on September 13, 2019.  (Doc.

No. 1.)  The Commission claims that Defendants violated Sections 206(1) and 206(2) of the

Investment Advisers Act by purchasing the higher-cost, standard version of UITs and by failing

to disclose that a lower cost UIT was available and that MIA's affiliate, MIS, benefitted from the

transactional sales charges.  (*Id.* ¶¶ 36–41.)  The Commission also claims that McDermott aided

and abetted MIA's violations of Sections 206(1) and 206(2).  (*Id.* ¶ 42–45.)  The Commission

names MIS as a relief defendant and seeks to recover the transactional service charges MIS

received from UIT purchases Defendants made on behalf of MIA's clients.  (*Id.* ¶¶ 46–49.)

On November 12, 2019, MIS moved to dismiss the Complaint for failure to state a claim.

(Doc. No. 13.)  The Honorable Joseph F. Leeson Leeson[6] denied the motion because the

Commission "sufficiently pled [MIS] (1) has received ill-gotten funds; and (2) does not have a

legitimate claim to those funds."  (Doc. No. 21.)

Following a period of discovery, the Commission filed a motion for summary judgment

(Doc. No. 46), which Defendants oppose (Doc. No. 57).  At the same time it moved for summary

judgment, the Commission moved to preclude the testimony of Defendants' expert Robert

Valker because Valker "formed no opinions in this case, and instead simply performed

mathematical calculations" based on a "hypothetical" fee Defendants may have charged had they

not purchased standard UITs.  (Doc. No. 48 at 5.)  Defendants oppose the motion, arguing that

Mr. Valker's calculations are "undeniably accurate" and "will only serve to assist the court and

jury in understanding [Defendants'] defenses."  (Doc. No. 56 at 4.)

---

[6] This matter was subsequently reassigned to the Honorable Karen Spencer Marston.  (Doc. No. 26.)

Defendants also seek to preclude the Commission's two experts.  First, they move to preclude the testimony of the Commission's expert Marti Murray, who has prepared a report and would offer testimony as to customs and practices in the investment adviser industry.  (Doc. No. 49.)  Defendants contend that Ms. Murray "lacks specialized knowledge of the particular subject matter of the litigation, and her Reports, opinions and testimony are inherently unreliable."  (*Id.* at 7.)  The Commission opposes the motion, arguing that Ms. Murray is "unquestionably qualified" and that her testimony "will be extremely helpful to the jury."  (Doc. No. 54 at 7–8.)  Ms. Murray also prepared a report to rebut Mr. Valker's calculations, which Defendants also seek to preclude.  (Doc. No. 49.)

Second, Defendants move to preclude the testimony of the Commission's expert Dr. Dennis Hamilton, who offered a report to rebut Mr. Valker's calculations.  (Doc. No. 50.)  Defendants argue that Dr. Hamilton's "opinions and testimony are inherently unreliable and irrelevant and will not assist the trier of fact in understanding the evidence or determining a fact issue."  (Doc. No. 50-1 at 4.)

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 outlines the conditions that must be met for a witness to testify as an expert:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and

> (d)     the expert has reliably applied the principles and methods to
>          the facts of the case.

Fed. R. Evid. 702.  This rule requires the trial judge to act as a "gatekeeper," ensuring that "any and all expert testimony or evidence is not only relevant, but also reliable."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)); *see also Sikkelee v. Precision Airmotive Corp.*, No. 4:07-CV-00886, 2021 WL 392101, at *2 (M.D. Pa. Feb. 4, 2021) ("A district court exercises more control over experts than over lay witnesses," because "expert evidence can be both powerful and quite misleading" given "the difficulty in evaluating it." (quotation marks omitted)).  "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).

To be admissible under Rule 702, expert testimony must satisfy "three major requirements:  (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact."  *Pineda*, 520 F.3d at 244.  These factors are often referred to as "qualification," "reliability," and "fit."  *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) ("We have explained that Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit.").

"Qualification requires that the witness possess specialized expertise."  *Pineda*, 520 F.3d at 244 (cleaned up).  However, the Third Circuit has counseled that "a broad range of knowledge, skills, and training qualify an expert."  *Id.*; *see also Schneider ex rel. Schneider*, 320 F.3d at 404; *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).  Under the reliability prong, an "expert's testimony is admissible so long as the process or technique the

expert used in forming the opinion is reliable." *Pineda*, 520 F.3d at 247 (quoting *In re Paoli R.R. Yard*, 35 F.3d at 742). In other words, the proffered testimony "must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation," and the "expert must have good grounds for his or her belief." *Schneider ex rel. Schneider*, 320 F.3d at 404 (cleaned up). Last, the "expert testimony must fit the issues in the case," meaning the "expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Id.*; *see also Daubert*, 509 U.S. at 591 ("Fit is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes.").

The party proposing the expert witness must show that each prong—qualification, reliability, and fit—is satisfied by a preponderance of proof. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000); *see also In re Paoli R.R. Yard*, 35 F.3d at 743 & 744 n.11 (explaining that the proponent must make more than a *prima facie* showing that a technique is reliable); *Ellison v. United States*, 753 F. Supp. 2d 468, 476 (E.D. Pa. 2010) ("The burden is on the proponent of the evidence—here the plaintiff—to establish admissibility by a preponderance of the evidence."). However, the Rules of Evidence generally "embody a strong preference for admitting any evidence that may assist the trier of fact," and Rule 702 has a "liberal standard of admissibility." *United States v. Downing*, 753 F.2d 1224, 1230 (3d Cir. 1985); *see also Oddi*, 234 F.3d at 156 ("The test is not whether the expert might have done a better job." (cleaned up)).

## III.   ANALYSIS

The Court considers the admissibility of each of the three experts' testimony in turn.

### A.   *Robert Valker*

Mr. Valker's expert report is three-pronged. (*See* Doc. No. 48-2.) First, he "calculate[s] the investment advisory fees and brokerage costs that were incurred [by MIA clients] and

compare[s] them to those that could have been incurred from March 2013 to December 2017"[7] had Defendants not purchased standard UITs.  (*Id.* at 3.)  Mr. Valker explains that MIA's clients incurred $159,592 in transactional sales charges because Defendants purchased standard version UITs for their accounts.  (*Id.* at 9.)  He further explains that, over the same period, the same clients would have incurred $1,685,219 in advisory fees and brokerage charges that MIS would have charged MIA's clients had they purchased the fee-based UITs.  (*Id.*)

Second, Mr. Valker "calculate[s] the percentage of UIT holdings for the client accounts in question and also for all of [MIA] accounts for the year-end 2013 and 2014."  (*Id.*)  He concludes that, for the 166 client accounts at issue,[8] UITs made up 6.86% of their holdings in 2013 and 7.88% of their holdings in 2014.  (*Id.*)  Third, Mr. Valker calculates that, during this Relevant Period, there were approximately 2.43 UIT trades per account (of the 166 accounts at issue).  (*Id.*)

The Commission seeks to preclude Mr. Valker's testimony because his calculation that clients would have incurred $1,685,219 in advisory fees and brokerage charges is hypothetical and is based on assumptions about what rates MIS would have charged and whether MIA clients would have been willing to pay those rates.  (Doc. No. 48-1 at 3–4.)  The Commission also seeks to preclude the other two calculations because they are simple mathematical calculations that are not in dispute.  (*Id.*)

For the reasons below, the Court grants the Commission's motion to preclude.

---

[7] Defendants contend that 2017 is a reasonable end date because "(1) Mr. Valker's firm was retained in early 2018 and (2) the benefits to MIA clients by reason of MIA's generous fee structure continued through that date—indeed, continues through today."  (Doc. No. 50-1 at 20.)

[8] For the purposes of this Memorandum, the accounts "at issue" are those for which Defendants purchased standard version UITs.

### 1.    Qualification

As an initial matter, the Court finds that Mr. Valker is qualified to testify as to his calculations.  He holds a bachelor's degree, with majors in finance and economics, and is a Certified Fraud Examiner and Certified Regulatory and Compliance Professional.  (Doc. No. 48-2 at 3.)  No court has deemed Mr. Valker unqualified to render an expert opinion, and the Commission does not dispute his qualification.  (*See* Doc. No. 48-3 at 29.  *See generally* Doc. No. 48-1.)  Considering these things together, the Court determines that Mr. Valker is qualified to have conducted these calculations and to testify about them.

### 2.    Reliability

The Commission disputes the reliability of Mr. Valker's testimony.  It argues that Mr. Valker's methodology for arriving at the $1,685,219 figure is unreliable because it depends on a series of assumptions Mr. Valker made at the direction of Defendants' counsel; namely, MIS would have charged MIA's clients its "standard rates," and MIA's clients would have been willing to pay those rates.  (*Id.* at 7.)

Federal Rule of Evidence 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  In assessing the reliability of an expert's testimony, a court must determine whether the "expert is basing his or her opinion on a type of data *reasonably* relied upon by experts."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 748–49.  A court must "assess whether there are *good grounds* to rely on this data to draw the conclusion reached by the expert."  *Id.* at 749 (emphasis added).  An expert's opinion does not rest on "good grounds" where the expert "simply relies on the data provided by his client without independent verification."  *Kremsky v. Kremsky*, CIVIL ACTION NO. 16-4474, 2017 WL 663091, at *2 (E.D. Pa. Feb. 17, 2017).  An expert's testimony

12

is not *per se* unreasonable because it relies on assumptions; however, where an expert's testimony relies on "assumptions that lack evidence or are wholly unreasonable," it should be excluded. *T.N. Inc. v. Fidelity Nat'l Info. Servs., Inc.*, CIVIL ACTION NO. 18-5552, 2021 WL 5980048, at *9 (E.D. Pa. Dec. 17, 2021).

To determine whether Mr. Valker's calculation is reliable, the Court considers whether the assumptions on which Mr. Valker relied were reasonable.

### a. "Standard Rates" Assumption

First, Mr. Valker's calculation rests on the assumption that MIS would have charged MIA's clients the standard rates that appeared on a 2017 Schedule of Portfolio Management Fees (the "2017 Schedule of Fees"). (*Id.* at 4.) The Commission argues that this calculation is unreliable because MIA's clients regularly negotiated to pay fees lower than the scheduled rates, but Mr. Valker "did not take into consideration any discounted rates." (Doc. No. 48-1 at 7.) Defendants respond that the proper way to challenge this assumption is by asking McDermott whether MIS would have charged MIA clients the standard rates listed in the 2017 Schedule of Fees, not by precluding Mr. Valker's testimony. (Doc. No. 56 at 7.)

It was unreasonable for Mr. Valker to base his calculations on the rates listed in the 2017 Schedule of Fees for several reasons. First, Mr. Valker was aware that MIS "was discounting the rates" but nevertheless "assumed that [MIS] would have charged [MIA's clients] the rate that is listed in accordance with that tier on the schedule." (Doc. No. 48-3 at 16–17.) Second, Mr. Valker performed these calculations for 2013 through 2017, but he assumed, with no basis, that MIS would have charged the rates listed in the *2017* Schedule of Fees for the entire period. (*Id.* at 15.) Mr. Valker does not explain why it was reasonable to have assumed the 2017 rates would have been in effect in 2013, other than that counsel directed him to base his calculations on the

2017 Schedule of Fees.  (*Id.*)  And finally, Mr. Valker has not identified any peer-reviewed publications or industry norms accepting this assumption as reasonable.  (*Id.* at 13.)

For these reasons, the Court finds that Mr. Valker's reliance on the 2017 schedule of fees, as opposed to the 2013 and 2014 schedule of fees, renders his conclusions unreliable.  That said, the Court recognizes that if Mr. Valker had used the 2013 and 2014 schedule of fees, his report is, at base, a simple calculation and would have been reliable.

### b.      MIA's Customers' Willingness to Pay

Second, Mr. Valker's calculation rests on the assumption that MIA's clients would have been willing to pay the rates listed in the 2017 Schedule of Fees.  The Commission argues that Mr. Valker's failure to account for the "economic reality that clients may not agree to a ten-fold increase in their fees" renders his testimony "inherently unreliable as a matter of economics." (Doc. No. 48-1 at 13.)  Again, Defendants argue that this goes to weight, not admissibility, and is not a basis to preclude Mr. Valker's testimony.  (Doc. No. 56 at 16.)

The Court agrees with Defendants—Mr. Valker's decision not to factor in MIA's clients' price sensitivities goes to his credibility, not to whether his testimony is admissible.  *See Krys v. Aaron*, 112 F. Supp. 3d 181, 199 (D.N.J. 2015) (holding that the defendants' challenges to the reasonable factual bases for the expert's report went to weight, not admissibility and explaining that such challenges are "properly presented through cross-examination, and not through exclusion of her otherwise reliable and relevant valuation work"); *United States v. 275.81 Acres of Land*, Civil Action No. 09–233, 2013 WL 989956, at *11 (W.D. Pa. Mar. 13, 2013) ("The United States' criticisms of Bell's supporting data and the application of his methodology go to the weight, not the admissibility, of Bell's testimony.  The government is free to attack Bell's testimony through testimony, evidence, and effective cross-examination at trial.").

* * *

In sum, although the assumptions made by Mr. Valker may be subject to vigorous cross examination, the Court finds that, to the extent the calculations are performed using standard rates charged in 2013 and 2014 (and not 2017), Mr. Valker's calculations are based in good grounds and, therefore, are reliable.

### 3.    Fit

The Commission also contends that Mr. Valker's calculation of the $1,685,219 figure does not fit the case because it is not relevant to whether Defendants breached their fiduciary duty and it accounts for fees that would have been incurred for three years after Defendants stopped the practice of purchasing standard version UITs for their discretionary clients.  (Doc. No. 48-1 at 15.)  Defendants argue that Mr. Valker's testimony "demonstrate[s] that MIA's comprehensive, interrelated fee structure, was very generous to, and resulted in substantial savings for, [its] clients."  (Doc. No. 56 at 18.)  They also contend that the period captured in Mr. Valker's analysis is relevant to the weight of the testimony, not its admissibility.  (*Id.* at 19.)  We agree with the Commission that Mr. Valker's conclusions, if presented as expert opinions, would confuse the jury.

First, we note that Mr. Valker concedes that his calculation is "divorced from any standards" in the investment adviser industry:  he did not consider whether Defendants complied with industry standards, and his calculations "would remain unchanged" regardless of whether Defendants disclosed the purported conflict of interest to MIA's clients.  (Doc. No. 48-3 at 6, 23, 28.)  And this calculation is just that—a mathematical calculation, *not* an opinion on Defendants' practices or their states of mind, so it would not be helpful to the jury to come in the form of expert testimony.  *See Kremsky*, CIVIL, 2017 WL 663091, at *3.

15

Second, Mr. Valker's calculation of the $1,685,219 in fees MIA's clients hypothetically would have incurred spans from 2013 *through 2017*. Comparing the fees that were incurred in 2013 to 2014 to the charges that hypothetically would have been incurred from 2013 to 2017 is comparing apples and oranges. Because the challenged practice stopped in 2014, Mr. Valker's analysis should have stopped in 2014, as well. But Mr. Valker's calculation is falsely inflated to make it look like the challenged practice benefitted MIA's clients far more than it actually did and runs a great risk of misleading the jury. *See Transamerica Life Ins. v. Daibes Gas Holdings Atlanta, L.L.C.*, Civil Action No. 18-10869 (SRC), 2021 WL 1541150, at *20 (D.N.J. Apr. 20, 2021) (explaining that an expert's testimony as to damages likely to be incurred in the future based on the plaintiff's current rate of return on its investments was very likely to "mislead and confuse the jury on the matter of actual lost yield damages").

Although Mr. Valker's calculation is not properly the subject of an *expert* opinion, an individual familiar with MIA and MIS's fee structure may testify as to the differential between the fees MIA customers paid and the fees that they would have paid had MIA purchased the fee-based UITs, instead. *See* Fed. R. Evid. 1006. However, to avoid confusing the jury, this individual may testify only as to the fees that MIA customers would have paid *during the relevant period* (2013 and 2014), and the calculation must use standard rates charged in 2013 and 2014, not in 2017.

Finally, as to the remaining calculations (about what percentage of holdings UITs constitute for the 166 accounts at issue and how many UIT trades Defendants executed per account), the Commission argues that there is "no need for expert testimony" because the "basic addition and division are not disputed." (Doc. No. 48-1 at 5.) Defendants do not respond to this argument. (*See generally* Doc. No. 56.) Because the parties can stipulate as to the fact of these

16

simple mathematical calculations, they are not the proper subject of expert testimony.

*      *      *

Because Mr. Valker's first calculation (of the $1,685,219 differential between the fees that would have been charged and the fees that were charged) is not a proper fit for this case, he is not permitted to testify as to his calculation as an expert.  Nevertheless, as discussed above, an individual familiar with MIA and MIS's fee structure may testify as to the differential between the fees paid and the fees that hypothetically would have been paid during the Relevant Period, and the Commission may cross-examine that individual on the reliability of the data used to calculate that differential.

And, because Mr. Valker's second and third calculations (of the percentage of MIA's clients' holdings UITs represented and the frequency MIA purchased UITs) are not in dispute, the Court grants the Commission's motion to preclude Mr. Valker's expert report and testimony.

### B.      *Dr. Dennis Hamilton*

Dr. Hamilton is a rebuttal witness; he prepared a report and would offer testimony only to rebut Mr. Valker's report and testimony.  Because the Court is granting the Commission's motion to preclude Mr. Valker's report and testimony, there is no need for Dr. Hamilton to offer a rebuttal report or rebuttal testimony.  (*See* Doc. No. 55 at 4 ("Dr. Hamilton's testimony will not be necessary if the Court grants the SEC's pending Motion to Preclude the Expert Testimony of Robert Valker.").)  Accordingly, Defendants' motion to preclude Dr. Hamilton's report and testimony is denied as moot.  However, because the Court is permitting Defendants to offer non-expert testimony on this subject, the Commission may raise the arguments presented in Dr. Hamilton's report on cross-examination.

17

### C.     Marti Murray

Ms. Murray offers two reports.  An initial report, which provides background on customs and practices in the investment adviser industry and opines on whether Defendants' UIT transactions and disclosures surrounding those transactions were in line with industry norms (the "Initial Report") and a rebuttal report, which rebuts Mr. Valker's calculations by opining that MIA's comprehensive fee structure did not actually result in savings to clients (the "Rebuttal Report").  (Doc. No. 49-2 at 10.)  In the Initial Report, Ms. Murray offers three opinions based on customs and practices in the investment advisory industry.  (*See generally id.*)

First, Ms. Murray opines that "[a] reasonable [investment adviser] knows that an advisory relationship rests on a foundation of trust" and that "the [investment adviser] must act in the best interest of the client."  (*Id.* at 11.)  She explains that clients typically grant their investment advisers discretion over all of their investment and trading decisions, which puts the investment adviser in a position of trust.  (*Id.*)  This position of trust "can be tested" when an investment adviser "engages in trades on behalf of advisory clients that result in additional benefits" for the investment adviser.  (*Id.*)  Accordingly, she states, "[a] reasonable [investment adviser] knows that these types of Conflicted Transactions . . . should be avoided."  (*Id.* at 12.)

Second, Ms. Murray opines that Defendants "failed to act in the best interest of their advisory clients in purchasing at least 403 [UITs]" because the UIT purchases were "conflicted transactions," and Defendants' disclosures were "inadequate and misleading."  (*Id.* at 12–20.)  She explains that MIA's UIT transactions were conflicted transactions because MIS, an entity wholly owned by McDermott, profited from the transactional sales charges MIA's clients paid on the higher-cost, standard UITs.  (*Id.* at 12–14.)  She suggests that Defendants could have "easily avoided" such conflicts had they purchased the lower-cost, fee-based UITs, instead.  (*Id.*

at 15.)  She further explains that investment advisers are permitted to engage in conflicted transactions so long as they "make full and fair disclosure of all conflicts of interest."  (*Id.* at 16.)  Here, Ms. Murray says, Defendants were obligated to make disclosures but failed to adequately do so.  (*Id.* at 17.)  She notes that a "reasonable investment adviser" would know that it had to disclose such conflicts and, even with disclosure and the client's informed consent, would have to continue acting in the client's best interest.  (*Id.* at 18.)

Third, Ms. Murray opines that Defendants "failed to meet their fiduciary obligation to seek best execution."  (*Id.*)  She explains that reasonable investment advisers are aware they have a duty to seek best execution for their clients and that Defendants' practice of purchasing higher-cost UITs when lower-cost UITs were available failed to satisfy that duty.  (*Id.* at 20.)  She acknowledges that Defendants believe, for a number of reasons, that their UIT purchasing practices satisfied the best execution requirement, but she explains that these purported justifications "are inconsistent with industry custom and practice."  (*Id.* at 21.)

After offering her opinions, Ms. Murray goes into detail on customs and practices in the investment adviser industry.  (*Id.* at 22.)  She explains "[investment advisers] have a fiduciary duty to advisory clients" (*id.*); "[investment advisers] must have policies and procedures that reasonably ensure compliance with its fiduciary duty" (*id.* at 23); the Commission has rules and regulations requiring investment advisers to make certain disclosures about their business practices (*id.* at 24); and investment advisers typically receive an advisory fee, while broker-dealers typically receive commissions or mark-ups on a transaction-by-transaction basis (*id.* at 25).  Ms. Murray then provides detail on the business structure of MIA and MIS and explains McDermott's role in both companies.  (*Id.* at 26–29.)  She notes that MIA "consistently acknowledged its fiduciary duty to advisory clients in its compliance manual."  (*Id.* at 30.)  She

also explains how UITs work.  (*Id.* at 31–35.)  Ms. Murray concludes by analyzing her opinions in connection with the background on industry custom and practice she provided earlier in the report.  (*Id.* at 35–49.)

In her Rebuttal Report, Ms. Murray opines that Mr. Valker's calculation that the MIA's comprehensive fee structure saved the firm's clients money is an after-the-fact explanation being offered to justify Defendants' UIT purchases.  (Doc. No. 49-2 at 78.)  She opines that investment advisers are very unlikely to operate with fee structures like Defendants' and notes that, even if MIA's clients were realizing savings on the whole, the structure still violates the duty of best execution.  (*Id.* at 79.)  Ms. Murray also explains that Mr. Valker's calculation is inflated because it extends beyond the relevant period and uses the rates charged in 2017 rather than the rates charged in 2013 and 2014.  (*Id.* at 80.)

Defendants have asked the Court to preclude Ms. Murray's Initial and Rebuttal Reports and testimony because Defendants claim that Ms. Murray is not qualified to testify as to the subject matter at issue and her reports and testimony are "inherently unreliable."  (Doc. No. 49-1 at 4.)  Defendants also argue that certain of Ms. Murray's conclusions are legal conclusions, which are not proper expert testimony.  (*Id.* at 8.)

For the reasons below, the Court grants in part and denies in part Defendants' motion.

### 1.     Qualifications

Ms. Murray has over 35 years' experience in the financial services industry.  (Doc. No. 49-1 at 7.)  She holds a Master of Business Administration from the NYU Stern School of Business and worked as an investment banker straight out of business school.  (*Id.*)  In 1987, she began working for Oppenheimer & Co., a broker-dealer and investment adviser, as a portfolio manager for a hedge fund that invested in distressed and bankrupt companies.  (*Id.*)  In 1990, she

went to Furman Selz Incorporated, a broker-dealer and investment adviser, and oversaw the firm's distressed debt investing department.  (*Id.*)  About five years later, she founded Murray Capital Management, an SEC-registered investment adviser specializing in distressed debt investing.  (*Id.* at 8.)  At its peak, Murray Capital had approximately $750 million in assets under management and advised clients such as pension funds, university endowments, family offices, and high net worth individuals.  (*Id.*)

In 2009, she retired from portfolio management and began offering financial and litigation support services as an expert witness.  (*Id.*)  She has been retained by the Commission as an expert in several matters, including *Securities and Exchange Commission v. Westport Capital Markets*, No. 17-cv-2064 (D. Conn.), and *Securities and Exchange Commission v. Ambassador Advisors, LLC*, No. 20-cv-2274 (E.D. Pa.).  (*Id.*)  *Westport Capital* and *Ambassador Advisors* are enforcement actions with similar facts to those in the case at hand.

Defendants argue that Ms. Murray "is not qualified to opine as to what custom and practice was in the investment advisor industry relevant to UIT trading practices and disclosures regarding UIT purchases" for four reasons:  (1) Ms. Murray primarily advises institutional, rather than retail, clients, but MIA primarily advises retail clients; (2) her expertise is primarily in the area of distressed debt investing; (3) she has never been a registered investment adviser and has never even taken the requisite licensing exam; and (4) she has never worked as a compliance officer.  (Doc. No. 49-1 at 10–11.)

The Commission responds, arguing that "[n]one of these distinctions makes a difference to Ms. Murray's qualifications to offer her opinions in this case."  (Doc. No. 54 at 15.)  The Court considers each of the purported deficiencies Defendants have identified in turn.

*Experience with Retail Investors.*  Defendants contend that Ms. Murray is not qualified

because Ms. Murray's clients "bear little resemblance to MIA's clients in type or number."
(Doc. No. 49-1 at 10.)  MIA had hundreds of retail clients, while Ms. Murray typically advised
institutional clients, such as pension funds or university endowments.  (*Id.*)  But investment
advisers owe a fiduciary duty to all clients, regardless of size.  *See* 15 U.S.C. §§ 80b-6(1)–(2)
(stating that investment advisors cannot employ devices to defraud or engage in practices that act
as a fraud or deceit upon "*any* client or prospective client" (emphasis added)).  Ms. Murray's
experience working with large institutional clients is directly applicable to her testimony about
MIA's fiduciary obligations to its smaller retail clients.

     *Expertise in Distressed Debt Investing.*  Next, Defendants argue that Ms. Murray is not
qualified because "her expertise was as a portfolio manager for funds engaged in distressed debt
investing." (Doc. No. 49-1 at 10.)  Ms. Murray worked for investment advisers for over twenty
years and managed her own investment advisory firm for much of that time.  Although her
specific focus was on distressed debt investing, the duty the advisory firms for which she worked
owed their clients is the exact same as the duty MIA owed its clients.  *See Sec. & Exch. Comm'n
v. Ambassador Advisors LLC*, --- F. Supp. 3d. ---, Civil No. 5:20-cv-02274-JMG, 2021 WL
6052589, at *2 (E.D. Pa. Dec. 21, 2021) (recognizing that the adviser–client relationship and
accompanying duties "remain the same no matter the type of investment the advisor pursues").
Defendants are asking the Court to define the relevant area of expertise far too narrowly (the
duty investment advisers owed retail customers in purchasing UITs from 2013 to 2014), when
the relevant area of expertise is more aptly defined at a much higher level (the duty investment
advisers owe their clients, generally).  Should Defendants wish to challenge Ms. Murray's
testimony given her expertise in distressed debt investing, they can do so on cross-examination.

*See id.*[9]

*Ms. Murray Is Not a Registered Investment Adviser.*  Defendants argue that it is "odd" that the Commission would proffer Ms. Murray as an expert because she "has never [been] a registered investment adviser, never took the necessary licensing exam, and never even studied for the licensing exam."  (Doc. No. 49-1 at 11.)  However, the Committee Notes to Federal Rule of Evidence 702 recognize that an individual may be qualified to serve as an expert based on experience alone.  Fed. R. Evid. 702 Advisory Comm. Notes.  Given Ms. Murray's extensive experience in the field, the fact that she did not sit for the investment adviser examination does not render her unqualified to offer opinions on the industry's customs and practices.  *See Ambassador Advisors*, 2021 WL 6052589, at *2 (finding Ms. Murray qualified to testify on norms in the investment advisory industry despite the fact that she is not a registered investment adviser).

*Ms. Murray Has Never Worked as a Compliance Officer.*  Finally, Defendants argue that Ms. Murray is not qualified to testify as to investment advisory industry norms because she "always worked in firms where there was a compliance department or Chief Compliance Officer in charge of all compliance matters" and she has never been a compliance officer.  (Doc. No. 49-1 at 11.)  But Defendants overlook Ms. Murray's thirteen years as the President of her own advisory firm, during which she was ultimately responsibility for the firm's compliance practices.  (*See* Doc. No. 49-2 at 8.)  *See also Ambassador Advisors*, 2021 WL 6052589, at *2

_____

[9] To the extent Defendants are arguing that Ms. Murray is not qualified because she left the industry in 2009 but the activity at issue in this case occurred in 2013–2014, this argument does not undermine Ms. Murray's qualifications.  Ms. Murray is testifying as to the fiduciary duty investment advisers owe their clients, and that duty has been in place since well before Ms. Murray's career began.  *See Sec. & Exch. Comm'n v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) (recognizing that investment advisers have a duty to disclose conflicts of interest to their clients).

(stating that Ms. Murray bore ultimate responsibility for compliance at Murray Capital and acknowledging that, even after she left Murray Capital, Ms. Murray "continued to review compliance customs and practices").

\* \* \*

Ms. Murray has worked in the investment advisory industry for decades.  Although she specialized in distressed debt investing and has worked primarily with large, institutional clients, she understands the field and has in-depth, first-hand knowledge of the duty investment advisers owe their clients.  Accordingly, the Court finds that Ms. Murray is qualified to testify as to customs and standards in the investment advisory industry.

### 2.    Reliability

Next, Defendants argue that Ms. Murray's Initial Report, Rebuttal Report, and testimony are unreliable because she does not—and could not—provide factual support for the standard industry practices since she "has no familiarity with UIT trading and disclosing practices among investment advisory firms."  (Doc. No. 49-1 at 13.)  But this is nothing more than a rehashing of Defendants' arguments about Ms. Murray's qualification, and the Court has already determined that Ms. Murray is qualified to offer this testimony.  *See supra* Section III.C.1.  Ms. Murray's testimony rests on her years of experience in the industry, and Courts in this Circuit have allowed experts to offer testimony based on such experience.  *See Ambassador Advisors*, 2021 WL 6052589, at \*2 (finding Ms. Murray's testimony on advisory industry custom and practice reliable); *see also, e.g.*, *Hartley v. GEICO Ins.*, CIVIL ACTION No. 16-4680, 2018 WL 11028643, at \*2–3 (E.D. Pa. Sept. 27, 2018) (concluding that expert testimony on claims-handling standards was reliable because it was based on the expert's 24 years of experience in the insurance industry); *Aamco Transmissions, Inc. v. Baker*, Civil Action No. 06–CV–05252,

2008 WL 5245768, at *4 (E.D. Pa. Dec. 16, 2008) (finding that an expert's testimony on standards in automobile industry was reliable because it was based on good grounds—i.e., his "extensive experience" in the automobile repair industry).

Because Ms. Murray's testimony rests on years of experience in the industry, the Court finds that it is reliable.

### 3.      Fit

Finally, Defendants argue that Ms. Murray's Initial Report, Rebuttal Report, and testimony are not a proper fit for this case because her "opinions and conclusions are improper statements of law and/or legal conclusions."  (Doc. No. 49-1 at 15, 19.)  Defendants contend that Ms. Murray's Initial and Rebuttal Reports improperly offers legal conclusions by "making general statements as to the rules governing the conduct of investment advisers" and by "opining that MIA and McDermott violated those rules."  (Doc. No. 49-1 at 16.)  The Commission responds, arguing that Ms. Murray's reports do not offer legal conclusions but rather offers an explanation of what reasonable investment advisers know their legal obligations to be based on industry custom and practice.  (Doc. No. 54 at 20–21.)

"While it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury, [the Third Circuit] has allowed expert testimony concerning business customs and practices."  *United States v. Leo*, 941 F.2d 181, 196 (3d Cir. 1991).  "These customs and practices will sometimes include applicable legal regulations, such as registration requirements for securities registration under the Securities Acts . . . ."  *United States v. Fumo*, 655 F.3d 288, 303 (3d Cir. 2011) (citing *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 218–19 (3d Cir. 2006)).  Testimony about whether a party's conduct comports with industry custom and practice is permissible; testimony about whether a

25

party's conduct comports with the law is not.  *Id.*

Here, Ms. Murray offers testimony on custom and practice in the investment advisory industry and opines on whether Defendants' conduct comported with industry standards.  For instance, her first opinion states, "A reasonable [investment advisor] knows that an advisory relationship rests on a foundation of trust—the [investment advisor] must act in the best interest of the client."  (Doc. No. 49-2 at 11.)  This is permissible testimony.  *See Berckeley*, 455 F.3d at 217–19.  Likewise, the "Background" section of Ms. Murray's report, which explains the regulatory framework and custom in the investment advisory industry and details MIA's and MIS's business structures (*id.* at 22–31), is permissible.  Even though Ms. Murray goes into detail on the regulatory framework regarding investment advisers' duties to clients, she does not usurp the court's role of explaining the law to the jury.  She does not provide this framework to explain the state of the law; rather, she explains the legal framework as a backdrop to the industry's custom and practice.  *See Ambassador Advisors*, 2021 WL 6052589, at *3 ("As an expert in industry custom and practice, Ms. Murray can testify to the ways in which industry custom and practice are shaped by legal frameworks.").

However, certain of Ms. Murray's opinions impermissibly wade into the realm of "legal conclusions."  For instance, her second opinion states, "MIA and McDermott failed to act in the best interest of their advisory clients, in purchasing at least 403 [UITs]."  (Doc. No. 49-2 at 13.)  This is not testimony on whether Defendants followed industry norms; it is testimony that goes directly to one of the central legal issues in this case—whether Defendants breached their fiduciary duty to their clients.  The sub-opinions undergirding Ms. Murray's second opinion likewise offer legal conclusions.  (*See id.* ("The UIT purchases were conflicted transactions."); *id.* at 16 ("[Defendants'] conflict disclosures were inadequate and misleading.").)  And, Ms.

Murray's third opinion—that "[Defendants] failed to meet their fiduciary obligation to seek best execution" (*id.* at 19)—also offers an impermissible legal conclusion.

In sum, as to the Initial Report, Ms. Murray is permitted to testify as to the following: (1) custom and practice in the investment advisory industry (including regulations that shape the industry custom and practice); and (2) whether Defendants' conduct comported with industry custom and practice.  She is not, however, permitted to testify as to whether Defendants breached their duties.  *See Ambassador Advisors*, 2021 WL 6052589, at *3 ("[H]er testimony will be inadmissible if she strays into offering opinions as to the legal duties Defendants had in this case or as to whether Defendants satisfied those legal duties.").[10]  And as to the Rebuttal Report, Ms. Murray is permitted to testify as to standard fee structuring practices in the investment adviser industry, but she is not permitted to testify as to the legality of MIA's comprehensive fee structure or the adequacy of Defendants' disclosures regarding the same.

## IV.   CONCLUSION

For the reasons above, the Court grants the Commission's motion to preclude Mr. Valker's report and testimony, denies Defendants' motion to preclude Dr. Hamilton's report and testimony as moot, and grants in part and denies in part Defendants' motion to preclude Ms. Murray's Initial and Rebuttal reports.

An appropriate Order follows.

---

[10] Defendants also argue that Ms. Murray's opinions on the adequacy of MIA's disclosures will not assist the trier of fact.  Because Ms. Murray's opinions on the adequacy of MIA's disclosures are impermissible legal conclusions and she will not be permitted to offer testimony on the adequacy of MIA's disclosures, we need not consider whether such testimony would assist the jury.