**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, <br><br> Plaintiff, <br><br> *v.* <br><br> **DEAN PATRICK MCDERMOTT**, et al., <br><br> Defendants. | **CIVIL ACTION** <br><br><br> **NO. 19-4229-KSM** |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                                                    **March 30, 2022**

Defendant Dean Patrick McDermott owns and operates an investment advisory firm,

Defendant McDermott Investment Advisors, LLC ("MIA").  (Doc. No. 57-1 ¶ 1.)  From 2013

through 2014, Defendants purchased certain securities that bore transaction fees for MIA's

clients even though those clients were eligible to purchase identical securities for no fee.  (*Id.* ¶

92.)  A portion of the transaction fees paid on those securities went to Relief Defendant

McDermott Investment Services, LLC ("MIS"), a broker-dealer wholly owned by McDermott.

(*Id.* ¶ 96.)  The U.S. Securities and Exchange Commission (the "Commission") commenced this

enforcement action against Defendants, alleging that their conduct violated Sections 206(1) and

206(2) of the Investment Advisers Act of 1940.  (Doc. No. 1.)  The Commission also claims that

McDermott is liable under Sections 209(d) and (f) of the Advisers Act for aiding and abetting

MIA's alleged violations of Sections 206(1) and 206(2).  (*Id.* ¶ 5.)  The Commission asks the

Court to order Relief Defendant MIS to disgorge any ill-gotten gains associated with

Defendants' purported wrongdoing and to "restrain[] and enjoin[] Defendants from, directly or

indirectly, violating Sections 206(1) and 206(2) of the Advisers Act."  (*Id.* at 11–12.)  Presently

before the Court is the Commission's Motion for Summary Judgment.  (Doc. No. 46.)  For the

reasons below, the Commission's motion is denied.

I.      BACKGROUND

        A.      *Factual Background*

        Viewing the facts in the light most favorable to Defendants, the relevant facts are as

follows.

                1.      **MIA's Business Structure**

        McDermott is the sole owner and managing member of MIA and MIS.  (Doc. No. 57-1

¶ 1.)  MIA was a registered investment adviser from September 2006 through September 2012

and has been a registered investment adviser from April 2014 through present.[1]  (*Id.* ¶ 2.)  MIS

has been a registered broker-dealer since 2011.  (*Id.* ¶ 3.)  As an investment adviser, MIA is

regulated by the Commission, and as a broker-dealer, MIS is regulated by the Financial Industry

Regulatory Authority.  (Doc. No. 57-2 ¶¶ 2–3.)

        MIA provides clients with investment advice in exchange for a fee, typically one to two

percent of the client's assets under management.  (Doc. No. 57-1 ¶ 6.)  From 2013 to 2014 (the

"Relevant Period"), MIA advised between 100 and 350 clients, most of whom were individual

retail investors.  (*Id.* ¶ 2.)  And from 2012 to 2015, MIA had between $50 million and $165

million in assets under management.  (*Id.*)  MIA offers two types of client relationships:

discretionary and non-discretionary.  (Doc. No. 57-1 ¶¶ 8, 81.)  For discretionary clients, MIA is

permitted to make investment decisions without client approval (*id.* ¶ 8), but MIA is not

---

[1] MIA was a state-registered investment adviser during the period from September 2012 through
April 2014.  (Doc. No. 57-1 ¶ 63.)  Although state-registered investment advisers are "not required to
comply with all aspects of the Investment Advisers Act of 1940" (*id.*), Defendants do not contend that
they are not liable for the claims alleged simply because MIA was state-registered during a portion of the
relevant period.

permitted to make investment decisions for non-discretionary clients without notifying them of the proposed decision and receiving their approval (*id.* ¶ 81).

During the Relevant Period, in addition to his role as MIA's sole owner and managing member, McDermott also served as MIA's Chief Compliance Officer.  (*Id.* ¶ 1.)  McDermott and MIA understood that they owed their clients a fiduciary duty to act in their clients' best interest, seek best execution of their transactions, and disclose all actual or potential conflicts of interest. (*Id.* ¶¶ 27, 32, 38, 47.)  MIA has a Compliance Manual, which reflects this understanding and "recognizes [MIA's] fiduciary duty to its clients."  (*Id.* ¶ 50.)  MIA's Advisory Agreement includes a section on best execution, which explains that "cost is not the sole factor considered in determining best execution."  (Doc. No. 57-2 ¶ 39.)  MIA's ADV Brochure[2] includes a similar section and explains that clients "should review all the fees charged by mutual funds, exchange traded funds, our firm, and others" "[t]o fully understand the total cost [they] will incur."  (*Id.* ¶¶ 40–42.)

### 2.    MIA's UIT Purchasing Practices

During the Relevant Period, MIA purchased Unit Investment Trusts ("UITs") on behalf of 166 of its discretionary clients.[3]  (*Id.* ¶ 11.)  A UIT is a portfolio of securities that terminates after a set period of time, typically 15 or 24 months.  (Doc. No. 49-2 ¶ 78.)  Investors purchase "units" of UITs through one-time public offerings.  (*Id.*)  UITs are similar to mutual funds; however, unlike mutual funds, UITs are not managed, and the portfolio of securities comprising

---

[2] Forms ADV are the forms investment advisers use to disclose conflicts of interest.  (Doc. No. 57-1 ¶ 115.)

[3] MIA did not purchase UITs for any of its non-discretionary clients (Doc. No. 57-1 ¶ 81), and McDermott does not recall whether he ever recommended that any of his non-discretionary clients purchase UITs (*id.* ¶ 82).

the UIT is static—it does not change once it is set.  (*Id.* ¶ 79.)

The UITs MIA purchased for its clients were available in standard and fee-based versions.  (Doc. No. 57-1 ¶ 88.)  The two versions of UITs are essentially the same, and they are composed of the same portfolio of securities.  (*Id.* ¶ 89.)  The only material difference between the standard and fee-based versions is the fee structure.[4]  (*Id.* ¶ 90.)  When purchasing standard UITs, investors incur a transactional sales charge, but there are no transactional sales charges associated with fee-based UITs.  (*Id.* ¶¶ 93–94.)

MIA's clients were eligible for the lower-cost, fee-based version of UITs, but MIA always purchased the standard version for its clients, and it always purchased the UITs from MIS, the broker-dealer wholly owned by McDermott.  (*Id.* ¶¶ 91–92, 98.)  Throughout the Relevant Period, MIA caused its clients to incur nearly $160,000 in transactional sales charges by purchasing standard, rather than fee-based, UITs.  (*Id.* ¶ 96.)  MIS earned $143,000 in revenue from the transactional sales charges on the UITs that MIA purchased on behalf of its discretionary clients.  (*Id.* ¶ 98.)

Although MIA's clients were saddled with transactional sales charges (allowing MIS to indirectly profit), McDermott believed this arrangement was "part of a comprehensive, inter-related fee structure" and was in his clients' best interest.  (Doc. No. 57-2 ¶ 26.)  Under an agreement between MIA and MIS, if MIA purchased standard version UITs, MIS would provide cost-free equity trades to MIA's clients.  (*Id.* ¶¶ 20–21.)  But if MIA purchased the lower-cost, fee-based version, MIS would not have offered cost-free equity trades, and MIA's clients may have incurred more charges on the whole.  (*Id.* ¶ 23.)  McDermott has admitted that transaction

---

[4] During his deposition, McDermott testified that standard and fee-based UITs are different "[e]conomically speaking" in ways other than the fee structure, but he did not elaborate on those economic differences.  (Doc. No. 57-3 at 330.)

sales charges are how MIS "derive[s] their income to pay the overhead." (Doc. No. 47-3 ¶ 4.)  In

fact, the revenue MIS earned on these charges exceeded MIS's net profit in the year 2013

($115,981) and more than doubled MIS's net profit in 2014 ($66,376).  (Doc. No. 57-1 ¶ 103.)

MIA did not explicitly notify its clients that it was purchasing (and incurring transaction

sales charges on) standard UITs from MIS on their behalf.  (*Id.* ¶ 119.)  Nor did MIA notify its

clients that it could have purchased lower-cost, fee-based UITs for them instead.[5]  (*Id.* ¶ 119.)

But the Form ADV that MIA provided its clients explained that they would "incur transaction

charges and/or brokerage fees when purchasing or selling securities" and noted that "[p]ersons

associated with [MIA] may receive commissions and other transaction-related compensation

from [MIA] in connection with client securities transactions."  (*Id.* ¶¶ 123, 125.)

After each UIT was purchased, MIA's clients received a prospectus from MIS's clearing

firm in connection with the purchase.[6]  (*Id.* ¶ 113.)  The prospectuses disclosed that MIA had

purchased standard UITs on the client's behalf (and thus incurred a transaction sales charge) and

that MIA could have purchased fee-based UITs (and thus not incurred a transaction sales

charge).  (*Id.* ¶ 142.)  The prospectuses did not disclose that MIS received a portion of the

transaction sales charge.  (*Id.* ¶¶ 133, 141.)  MIA's clients also received transaction confirmation

statements after MIA purchased a UIT on their behalf.  (*Id.* ¶ 144.)  These statements indicated

that MIA had purchased a standard version UIT but did not list any fees associated with the

transaction; however, the statements indicated that the prospectus, which would be provided by

---

[5] Although Defendants contend the standard UITs were purchased as "part of a comprehensive, inter-related fee structure" that was in Defendants' clients' best interest, there does not appear to be evidence in the record of a different fee structure for the clients for whom Defendants did not purchase standard UITs.  (*See* Doc. No. 47-2 at 21.)

[6] The prospectuses are written by the UIT's sponsors and are not specific to MIA or its clients. (*Id.* ¶¶ 139–40.)

mail, listed the fees.  (*Id.*)

### 3.    MIA's Discussions Regarding Its UIT Purchasing Practices

During the Relevant Period, MIA engaged Ara Jabrayan of RIA Compliance Group ("RIA") as its outside compliance consultant.  (*Id.* ¶ 151.)  RIA reviewed MIA's Compliance Manual and regularly provided risk alerts and updates on actions involving the Commission or other regulators.  (*Id.* ¶¶ 153, 155.)  In October 2013, Jabrayan sent an RIA alert discussing a case "in which an investment adviser was found to have violated its duty to seek best execution by purchasing higher-cost mutual fund share classes when lower-cost share classes were available to clients."  (*Id.* ¶¶ 156–57.)  In the alert, Jabrayan explained that "[advisers] must carefully analyze whether their clients are receiving the most beneficial terms that are reasonably available for their order, especially if those transactions are executed through affiliated broker-dealers."  (*Id.* ¶ 160.)

In December 2013, Mark Fowler, an Examiner for the Commission, met with McDermott regarding MIA's UIT transactions.  (*Id.* ¶ 163.)  Fowler and McDermott discussed MIA's practice of purchasing standard UITs rather than fee-based UITs, and Fowler informed McDermott about a recent enforcement action, *In re Sarkauskas & Associates, Inc.*, Advisers Act Release No. 3669, 2013 WL 4883131 (Sept. 13, 2013).  (*Id.* ¶ 165.)  In *Sarkauskas*, the Commission "found that the investment adviser . . . breached its fiduciary duties . . . by putting its clients in a version of UITs paying a transactional sales charge when a lower-cost share class was available to clients."  (*Id.* ¶ 166.)  Fowler and McDermott discussed differences in the facts of *Sarkauskas* and MIA's UIT transactions.  (Doc. No. 57-2 ¶ 66.)  Fowler sent a closing letter following his examination, and he did not mention MIA's UIT transactions.  (*Id.* ¶¶ 72, 74.)

McDermott never discussed MIA's UIT transaction practices with Jabrayan or counsel.

(Doc. No. 57-1 ¶ 171.)

### B.    *Procedural History*

The Commission commenced this action against Defendants on September 13, 2019.

(Doc. No. 1.)  On November 12, 2019, MIS moved to dismiss the Complaint for failure to state a

claim.  (Doc. No. 13.)  The Honorable Joseph F. Leeson[7] denied the motion because the

Commission "sufficiently pled [MIS] (1) has received ill-gotten funds; and (2) does not have a

legitimate claim to those funds."  (Doc. No. 21.)

Following a period of discovery, the Commission filed a motion for summary judgment.

(Doc. No. 46.)  The Commission argues that Defendants knowingly (or, at a minimum,

negligently) violated their fiduciary duties to MIA's clients by purchasing "more expensive

versions of the *exact same investment products* . . . in order to line their own pockets, and

without disclosing the inherent conflict of interest."  (Doc. No. 46-1 at 8–9.)  Defendants oppose

the motion.  (Doc. No. 57.)  Defendants argue that a variety of factual disputes preclude

summary judgment, including "(1) whether Defendants acted in the best interest of their clients;

(2) whether MIA's conflict of interest disclosures were adequate; (3) the detail with which MIA

was required to make disclosures regarding UIT sales practices; and (4) whether Defendants

were 'on notice' that their UIT sales practices were violating the securities laws."  (*Id.* at 8.)

Simultaneously with its motion for summary judgment, the Commission moved to

preclude the testimony of Robert Valker.  (Doc. No. 56.)  Defendants moved to preclude the

testimony of Marti Murray (Doc. No. 49) and Dr. Dennis Hamilton (Doc. No. 50).  The Court

has ruled on the motions to preclude in a separate opinion filed contemporaneously herewith.

---

[7] This matter was subsequently reassigned to the Honorable Karen Spencer Marston.  (Doc. No.
26.)

## II.     LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  "[T]he inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks and alterations omitted).

## III.    ANALYSIS

The Commission claims that Defendants' UIT purchasing practices violated Section 206(1) and 206(2) of the Advisers Act because Defendants failed to act in their clients' best interest, seek best execution, and disclose the conflict of interest posed by the UIT transactions. (Doc. No. 46 at 12–13.)

Section 206(1) prohibits investment advisers from "employ[ing] any device, scheme, or artifice to defraud any client or prospective client."  15 U.S.C. § 80b-6(1).  Section 206(2) prohibits investment advisers from "engag[ing] in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."  *Id.* § 80b-6(2).  To

prevail on a Section 206(1) claim, the Commission must show the investment adviser breached the fiduciary duty he owes his clients and acted with scienter.  *See Sec. & Exch. Comm'n v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 192 (1963).  That is, the Commission must show the investment adviser acted intentionally, knowingly, or recklessly in breaching his fiduciary duty.  *Sec. & Exch. Comm'n v. Westport Capital Markets LLC*, 408 F. Supp. 3d 93, 105 (D. Conn. 2019) (quoting *Sec. & Exch. Comm'n v. Penn*, 225 F. Supp. 3d 225, 267–37 (S.D.N.Y. 2016)).  However, to prevail on a Section 206(2) claim, the Commission need only show the investment adviser breached his fiduciary duty by acting negligently.  *Sec. & Exch. Comm'n v. Steadman*, 967 F.2d 636, 643 (D.C. Cir. 1992).  Other than the requisite intent, Sections 206(1) and 206(2) are identical and can be analyzed together.  *Westport Capital*, 408 F. Supp. 3d at 106.

"As fiduciaries, investment advisers owe their clients a duty of loyalty."  *Sec. & Exch. Comm'n v. Ambassador Advisors*, --- F. Supp. 3d ---, Civil No. 5:20-cv-02274-JMG, 2021 WL 5998456, at *3 (E.D. Pa. Dec. 20, 2021) (citing *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 270 (3d Cir. 1998)).  This duty requires investment advisers to (1) disclose conflicts of interest, (2) act in their clients' best interest, and (3) seek best execution.  *Id.*  An adviser's failure to adhere to any of these three requirements constitutes a breach of his fiduciary duty.  *Id.*

The Commission argues Defendants violated all three requirements in connection with their UIT purchasing practices.  (Doc. No. 46 at 10.)  Defendants argue they sufficiently disclosed any potential conflicts and claim that their advisory clients actually benefitted from the arrangement afforded by the UIT transactions.  (Doc. No. 57 at 8–9.)

### 1.      Disclosure of Conflict of Interest

First, the Commission contends that Defendants violated their fiduciary duties by failing

to "fully and fairly disclose" the conflict of interest inherent in their UIT purchasing practices to

their clients.  (Doc. No. 46-1 at 14.)  Investment advisers are required to make "full and frank

disclosure" of any conflicts of interest.  *Capital Gains*, 375 U.S. at 197.  The Supreme Court

explained the policy undergirding this requirement in *Capital Gains*:

> An adviser who . . . secretly trades on the market effect of his own recommendation may be motivated—consciously or unconsciously—to recommend a given security not because of its potential for long-run price increase (which would profit the client), but because of its potential for short-run price increase in response to anticipated activity from the recommendation (which would profit the adviser).  An investor seeking the advice of a registered investment adviser must, if the legislative purpose [of the Adviser's Act] is to be served, be permitted to evaluate such overlapping motivations, through appropriate disclosure, in deciding whether an adviser is serving "two masters" or only one, "especially if one of the masters happens to be economic self-interest."

*Id.* at 196.  To this end, investment advisers are required to "fully and fairly reveal[] [their]

personal interest in these recommendations to . . . clients."  *Id.* at 201.

Defendants concede their UIT purchasing practices posed a conflict of interest that they

were required to disclose.  (Doc. No. 57 at 20.)  Defendants never made any oral representations

to clients regarding their UIT purchasing practices (*see generally id.*), so the Court need only

consider whether MIA's written disclosures adequately disclosed the conflict.  Defendants argue

that they satisfied their disclosure obligation through a combination of MIA's Form ADV and

prospectuses and trade confirmations.  (Doc. No. 57-2 ¶ 38.)

### i.      Recent Cases

In two recent cases, courts considered whether investment advisers adequately disclosed

somewhat similar conflicts of interest.

In *Securities and Exchange Commission v. Westport Capital*, 408 F. Supp. 3d 93 (D.

Conn. 2019), the defendant was registered as an investment adviser and a broker-dealer.  *Id.* at

100.  The defendant invested its advisory clients' money in mutual funds.  *Id.*  There were two

classes of mutual funds available to the defendant's clients:  "Class A" shares and "adviser class"

shares.  *Id.*  The Class A shares carried a "12b-1 fee," which was eventually paid to the broker-

dealer; the adviser class shares included no such fees.  *Id.*  Over a five-year period, the defendant

chose to purchase Class A, rather than adviser class, shares for its clients.  *Id.*  This generated

$105,968 in 12b-1 fees for the defendant in its capacity as a broker-dealer (in addition to the

advisory fee the defendant earned in its capacity as an investment adviser).  *Id.*  The parties

agreed this arrangement created a conflict of interest that the defendant was required to disclose

but they disagreed as to whether the defendant's disclosures were adequate.  *Id.* at 101.

        The court found the defendant's disclosures inadequate because they were vague and

internally contradictory.  *Id.* at 104–05.  The defendant's Form ADV "warned clients that [the

defendant] *might* be deriving additional compensation from [its] trading activities on the clients'

behalf" but "did not advise the clients that [it was] *actually* doing so, much less how they were

specifically doing so by . . . garnering 12b-1 fees from mutual fund transactions."  *Id.* at 104.  In

a later section of the Form ADV, the Form asked whether the defendant received "distribution or

service ('trail') fees from the sale of mutual funds," but the defendant failed to disclose that it

was receiving 12b-1 fees.  *Id.* at 101, 105.  The court found the word "might" (especially when

coupled with the defendant's outright failure to disclose the conflict even when directly asked

whether it was receiving such fees) rendered the defendant's disclosures insufficiently vague.  *Id.*

at 105.  The court explained that the defendant's clients "did not understand that their adviser

had motives to engage in trades that could well *lose* money for them while still *gaining* money

for [the defendants]."  *Id.*[8]

_____

        [8] The facts of *Westport Capital* are similar to those of *Robare Group, Ltd. v. Securities and
Exchange Commission*, 922 F.3d 468 (D.C. Cir. 2019).  In *Robare*, the investment adviser had entered

The court was presented with a similar situation in *Securities and Exchange Commission v. Ambassador Advisors*, --- F. Supp. 3d ---, Civil No. 5:20-cv-02274-JMG, 2021 WL 5998456 (E.D. Pa. Dec. 20, 2021).  There, the defendant, an investment adviser, charged its clients an advisory fee but also "indirectly collected" 12b-1 fees from mutual funds in which they invested their clients' money.  *Id.* at *1.  The parties agreed this was a conflict of interest, but the defendant claimed that it had sufficiently disclosed the conflict.  *Id.* at *2.  The defendant's disclosures warned that it "may receive commission-based compensation in connection with the purchase and sale of securities, including 12b-1 fees" in addition to advisory fees.  *Id.* at *5. Other disclosures indicated that the defendant's advisers "may receive 12b-1 fees from mutual funds that pay such fees."  *Id.*  But nowhere in its disclosures did the defendant explicitly state that it *would* be receiving 12b-1 fees.  *Id.*  Additionally, prospectuses and trade confirmations provided after each transaction provided information on the 12b-1 fees charged.  *Id.* at *6.

Both parties moved for summary judgment.  *Id.*  The court declined to grant summary judgment for the defendant because "[its] disclosures could have been more clear, direct and thorough."  *Id.*  It explained that the defendant could have included all of the information regarding its receipt of 12b-1 fees in a "single, logically sequenced paragraph" rather than "scattered" throughout the disclosures.  *Id.*  It also reasoned that the defendant could have "used a more definite verb than 'may' to describe [its] receipt of 12b-1 fees when [it] would almost certainly always be receiving these fees."  *Id.*  The court also declined to enter summary judgment in favor of the Commission.  *Id.* at *9.  The court agreed that the use of the word

---

into a revenue sharing agreement with a third party. *Id.* at 474.  The investment adviser's disclosures indicated that it "may" receive "selling compensation," but, elsewhere, its disclosures misleadingly indicated that it had not entered into revenue sharing agreements. *Id.* at 474–76.  The court held that the combination of the vague language and the misleading statements rendered the defendant's disclosures inadequate. *Id.* at 477.

"may" rendered the disclosures vague but declined to hold that "such a use of 'may' will always

render a disclosure inadequate . . . as a matter of law."  *Id.* at \*8.  The court distinguished the

case from *Westport Capital* because, in *Westport Capital*, the disclosures had been vague *and*

misleading, but in *Ambassador Advisors*, the disclosures were vague but *not* misleading because

the defendants never affirmatively disavowed receiving the funds.  *Id.* at \*7.  Ultimately, the

court concluded the jury was best suited to determine whether the defendant's disclosures

adequately disclosed the conflict of interest.  *Id.* at \*9 ("Because [the] disclosures fall in the gray

area between clearly sufficient and clearly insufficient, the Court must leave it to the jury to

determine whether [the] disclosures were adequate.").

### ii.    MIA's Form ADV, Prospectuses, and Trade Confirmations

MIA's Form ADV[9] explains that "[a]ny material conflicts of interest between you and

our firm, or our employees are disclosed in this Disclosure Brochure."  (Doc. No. 57-1 ¶ 117.)

Specifically, it states,

> As part of our investment advisory services to you, we may invest,
> or recommend that you invest, in mutual funds and exchange traded
> funds.  The fees that you pay to our firm for investment advisory
> services are separate and distinct from the fees and expenses charged
> by mutual funds or exchange traded funds (described in each fund's
> prospectus) to their shareholders.  These fees will generally include
> a management fee and other fund expenses.  You will also incur
> transaction charges and/or brokerage fees when purchasing or
> selling securities.  These charges and fees are typically imposed by
> the broker-dealer or custodian through which your account
> transactions are executed.

(*Id.* ¶ 123.)  Elsewhere, the Form ADV states, "We do not share in any portion of the

brokerage/fees/transaction charges imposed by the broker-dealer or custodian."  (*Id.* ¶ 124.)

It also provides, "Persons associated with [MIA] . . . may receive commissions and other

---

[9] MIA updated its Form ADV annually, but the 2013 and 2014 Forms ADV are materially
identical in all relevant regards.

13

transaction-related compensation from [MIA] in connection with client securities transactions."
(*Id.* ¶ 125.)  The Form ADV also "recommend[s]" the brokerage services of MIS and discloses

that clients "may pay higher commissions and/or trading costs [i]n recognition of the value of

research services and additional brokerage products and services [MIS] provides."  (Doc. No. 57-

2 ¶ 40.)  Finally, it explains that clients "should review all the fees charged by mutual funds,

exchange traded funds, our firm, and others" in order to "fully understand the total cost [they]

will incur."  (*Id.* ¶ 42.)

Despite these broad disclosures, the Form ADV does not specifically disclose that

Defendants were purchasing higher-cost, standard UITs even though materially identical, lower-

cost, fee-based UITs were available to their advisory clients.  (Doc. No. 57-1 ¶ 119.)  Nor does

the Form ADV disclose the additional costs MIA's clients incurred or the revenue MIS earned in

connection with the UIT transactions.  (*Id.* ¶¶ 121–22.)

In addition, after MIA purchased a UIT on behalf of a client, that client received a

prospectus from the clearing house that executed the transaction.  (*Id.* ¶ 132.)  Each prospectus

explained that two versions of UITs were available and indicated that the standard version UIT

bore a transactional sales charge and the fee-based version did not.  (Doc. No. 57-2 ¶ 35.)  Trade

confirmations, which clients also received after the UIT transactions were executed, indicated

whether MIA had purchased a standard or fee-based UIT on the client's behalf.  (*Id.* ¶ 75.)

This case is more akin to *Ambassador Advisors* than to *Westport*:  Defendants'

disclosures could have been clearer, but they are not misleading, so the Court finds that a jury

should decide whether the disclosures in this case were adequate.

As noted above, MIA's Form ADV explains that "[p]ersons associated with [MIA] . . .

*may receive* commissions and other transaction-related compensation from [MIA] in connection

with client securities transactions." (Doc. No. 57-1 ¶ 125 (emphasis added).) The Form ADV

also recommends MIS's brokerage services and discloses that MIA's clients "*may pay* higher

commissions and/or trading costs" in exchange for the "additional brokerage products and

services" MIS provides." (Doc. No. 57-2 ¶ 40.) The Commission argues these disclosures are

inadequate because the word "may" does not clearly convey that persons affiliated with MIA

*were actually* receiving transaction-related compensation or that MIA's clients *were actually*

paying higher commissions. (Doc. No. 46-1 at 16.)

But the Court cannot agree with the Commission on this point. The use of the word

"may" is vague, but it is not necessarily incorrect or misleading. In fact, the use of the word

"may" may have been the most accurate way to disclose the conflict. Defendants only purchased

standard version UITs on behalf of certain of MIA's clients for a period in 2013 and 2014, so its

clients were not *always* or *necessarily* incurring higher fees, and MIS was not always indirectly

benefitting therefrom. Had the disclosures used the word "will," they would have been incorrect

during the periods before and after Defendants engaged in the UIT purchasing practices at issue.

In any event, the Court cannot decide whether the disclosures are adequate; rather, as in

*Ambassador Advisors*, the jury is best suited to determine whether Defendants' use of the word

"'may' rendered their disclosures inadequately informative." 2021 WL 599845, at *7.[10]

Additionally, the fact that the Form ADV does not mention "the availability of the lower-

cost, fee-based version of the same UIT" (Doc. No. 46-1 at 17) does not render the disclosures

inadequate. As discussed above, the Form ADV discloses that MIA clients may pay transaction

charges. (Doc. No. 57-1 ¶ 125.) Reading the disclosures in the Form ADV together, a

reasonable jury could find this disclosure sufficient to alert investors that they are paying more

---

[10] A finding that Defendants' disclosures were inadequate would support a finding that
Defendants failed to disclose their conflict of interest and thus violated their fiduciary duty.

under MIA's arrangement than they may be otherwise.  *Ambassador Advisors*, 2021 WL 599845, at *7.

The Commission also argues that, like the disclosures in *Westport Capital*, MIA's Form ADV was "more than just inadequate: [it was] outright misleading."  (Doc. No. 46-1 at 16.)  The Form ADV says, "*We* do not share in any portion of the brokerage fees/transaction charges imposed by the broker-dealer or custodian."  (Doc. No. 57-1 ¶ 124.)  But the "we" refers to MIA, not MIS.  And only MIS profits on the transaction sales charges earned on UITs, not MIA.  Accordingly, this statement is *technically* correct.  Defendants' disclosures could have been clearer, but they are not misleading.  McDermott is the sole owner of MIA, and MIS and the companies are closely related, so a reasonable investor could think this disclosure means that neither MIA nor any of its affiliates, including McDermott and MIS, earned a portion of the transaction charges.  However, this is a question for the jury, not for the Court.  *See Durning v. First Boston Corp.*, 815 F.2d 1265, 1268 (9th Cir. 1987) ("Only if the disclosure is so obvious that reasonable minds cannot differ is the issue appropriately resolved as a matter of law.  Like materiality, adequacy of disclosure is normally a jury question." (internal citations omitted)); *cf. Sec. & Exch. Comm'n v. Cetera Advisors LLC*, Civil Action No. 19-cv-02461-MEH, 2020 WL 1905046, at *4 (D. Colo. Apr. 17, 2020) ("The general rule [is that] materiality in the context of a Section 206(2) claim is a fact-intensive inquiry that will be left for the jury to determine." (citing *Sec. & Exch. Comm'n v. Gruss*, 245 F. Supp. 3d 527, 597 (S.D.N.Y. 2017))); *Sec. & Exch. Comm'n v. Nutmeg Grp., LLC*, 162 F. Supp. 3d 754, 778 (N.D. Ill. 2016) ("Because the issue of materiality is so fact-intensive, it is usually a question for the jury." (cleaned up)).

Finally, when read together, the prospectuses and trade confirmations show that standard UITs bear transactional sales charges, that fee-based UITs do not, and that MIA purchased

standard UITs on behalf of its clients. (Doc. No. 57-2 ¶ 75.) The Commission argues that any

disclosures that may appear in the prospectus or trade confirmation are irrelevant because clients

do not receive those documents until after the UIT has been purchased. (Doc. No. 46-1 at 18.)

But even though investors do not receive prospectuses until after the UIT has been purchased,

they "had ten days to rescind the trade" after the UIT was purchased and the prospectus was

delivered. (Doc. No. 57-2 ¶ 35.) A reasonable jury could find the disclosures contained in the

prospectuses and trade confirmations adequately disclosed the fact that MIA investors were

paying for higher-cost UITs when lower-cost UITs were available, and a reasonable jury could

also find these after-the-fact disclosures sufficient because they were delivered with sufficient

time for the investor to rescind the trade. *Ambassador Advisors*, 2021 WL 5998456, at *6

("Ostensibly, a client could have combined the information provided in the trade confirmations

with the information in the prospectuses and determined exactly how much the client was paying

in 12b-1 fees.").

MIA's disclosures are not as direct or forthcoming as they could be, but they are not so

vague or misleading as to be inadequate as a matter of law. Only a jury can determine whether

MIA's disclosures sufficiently informed investors of Defendants' conflict of interest.

### 2.      Best Interest

Second, the Commission argues that Defendants violated their duty of best interest

because McDermott "put his interests ahead of his client's interests" by purchasing standard,

rather than fee-based, UITs. (Doc. No. 46-1 at 21.) The fiduciary duty of loyalty "requires

advisers to manage their clients' portfolios in the best interest of the clients." *Goldstein v. Sec. &

Exch. Comm'n*, 451 F.3d 873, 881 (D.C. Cit. 2006) (internal citation omitted). "Under the 'best

interest' test, an adviser may benefit from a transaction recommended to a client if, and only if,

that benefit and all related details of the transaction are fully disclosed." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 503 (3d Cir. 2013).

Defendants contend that their practice of purchasing higher-priced, standard UITs was in the best interest of their clients because it was part of a "comprehensive fee structure" that, on the whole, benefitted MIA's clients. (Doc. No. 57 at 16.) Because Defendants purchased these higher-cost UITs, MIS provided MIA's clients with "cost-free equity trades." (Doc. No. 57-2 ¶ 23.) Had Defendants purchased the lower-cost, fee-based UITs instead, the clients would not have had to pay a transactional sales charge, but then MIS would not have provided cost-free equity trades. (*Id.*) This would have caused the clients who purchased the standard UITs to incur "substantially more than $160,000 in charges." (*Id.*)

MIA's "comprehensive fee structure" is similar to the arrangement in *Ambassador Advisors*. The defendants there "struck a deal with their clients under which they would collect 12b-1 fees on certain mutual fund investments in exchange for charging their clients a lower advisory fee." 2021 WL 5998456, at *11. The court concluded that this arrangement could have been in the clients' best interest. *Id.* Because this arrangement may have been in the clients' best interest, the court refused to grant summary judgment in favor of the Commission. *Id.*

The same is true here—a reasonable jury could conclude that Defendants' UIT transaction practices were in MIA's clients' best interest.

### 3.     Best Execution

Finally, the Commission claims Defendants failed to seek best execution when they purchased standard, rather than lower-cost, fee-based, UITs. (Doc. No. 46-1 at 13–14.) The duty of best execution requires a fiduciary "to obtain for its customer the most favorable terms reasonably available under the circumstances." *Newton*, 135 F. 3d at 270. "This obligation

requires investment advisers to seek the lowest price reasonably available for a client unless the more expensive option results in better service." *Malouf v. Sec. & Exch. Comm'n*, 933 F.3d 1248, 1264 (10th Cir. 2019) (citing *Newton*, 135 F.3d at 270 n.2).

Defendants argue that they satisfied the duty of best execution because, even though lower-cost UITs were available, the practice of purchasing higher-cost UITs was justified since it meant that MIS offered cost-free equity trades.  (Doc. No. 57 at 18.)  They contend that this was part of MIA's comprehensive fee structure and  "provided [MIA's] clients superior service and value": "Had MIA's advisory clients used a broker-dealer other than MIS, they almost certainly would have had to pay commissions and ticket charges on their equity trades, and they would have incurred fees substantially in excess of what they incurred using MIS as their broker and getting the benefit of cost-free equity trades."  (*Id.*)

Although Defendants did not procure the lowest price UITs, a reasonable jury could find that they secured the best value for MIA's clients *on the whole* because MIA's clients received cost-free equity trades in exchange.  *See Ambassador Advisors*, 2021 WL 5998456, at *11 (concluding that a reasonable jury could find the defendant's arrangement satisfied the duty of best execution even though the defendant did not purchase the lowest price mutual fund because the transactions were not to be considered "in a vacuum" and the defendant's clients may have received benefits in exchange for purchasing the higher-priced mutual funds).  That said, the Court finds it notable that clients for whom MIA was *not* purchasing UITs also received the benefits of cost-free equity trades from MIS.  This could affect the jury's analysis of whether MIA's UIT clients received best execution on the whole.  Either way, the jury, and not the Court, is best suited to determine how this fact affects the best execution analysis.

*        *        *

A reasonable jury could find that Defendants fully and fairly disclosed the conflict of interest, acted in MIA's clients' best interest, and achieved best execution.[11]  The Commission's motion for summary judgment is denied.

## IV.    CONCLUSION

For the reasons above, the Commission's motion is denied.  An appropriate Order follows.

---

[11] Because the Court cannot determine as a matter of law whether Defendants breached their fiduciary duties, we need not consider whether Defendants acted with scienter or negligently.