**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | **CIVIL ACTION** |
| Plaintiff, | **NO. 19-4229-KSM** |
| *v.* | |
| **DEAN PATRICK MCDERMOTT**, et al., | |
| Defendants. | |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                                                  **June 24, 2022**

Defendant Dean Patrick McDermott owns and operates an investment advisory firm, Defendant McDermott Investment Advisors, LLC ("MIA").  (Doc. No. 57-1 ¶ 1.)  From 2013 through 2014, Defendants purchased certain securities for their clients that bore transaction fees even though those clients were eligible to purchase essentially identical securities for no fee.  (*Id.* ¶ 92.)  A portion of the transaction fees paid on those securities went to Relief Defendant McDermott Investment Services, LLC ("MIS"), a broker-dealer wholly owned by Mr. McDermott.  (*Id.* ¶ 96.)  On September 13, 2019, the U.S. Securities and Exchange Commission (the "Commission") commenced this enforcement action against Defendants, alleging that their conduct violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940.  (Doc. No. 1 ¶¶ 36–41.)  The Commission also claims that Mr. McDermott aided and abetted MIA's alleged violations of the Advisers Act in violation of Section 209(f) of the Advisers Act.  (*Id.* ¶¶ 42–45.)  The Commission asks the Court to permanently enjoin and restrain Defendants from directly or indirectly violating Sections 206(1) and 206(2) (*id.*) and seeks to recover any ill-gotten gains from MIS (*id.* ¶¶ 46–49).

The Commission and Defendants have both filed motions *in limine*.  For the reasons discussed below, the Court grants in part and denies in part the Commission's motions *in limine* and grants in part and denies in part Defendants' motions *in limine*.  Because we write only for the parties, we do not include a detailed recitation of the facts.  A more thorough recitation of the facts is included in the Court's opinion on the motion for summary judgment.  (*See* Doc. No. 67.)

### A.     *Defendants' Motions in Limine*

Defendants filed five motions *in limine*.  They seek to preclude evidence, testimony, and argument regarding the timing of prospectus delivery, irrelevant brokerage account documents, Commission and judicial opinions, Mr. McDermott's Ph.D. from LaSalle University, and settled orders between the Commission and Mr. McDermott and third parties.  (Docs. No. 82–86.)  The Commission opposes the motions.  (Docs. No. 99–102.)  We address each in turn.

### 1.     Motion to Preclude Evidence of and References to the Timing of Prospectus Delivery

Defendants ask the Court "to exclude all evidence or references to the timing of prospectus delivery."  (Doc. No. 82 at 2.)  The Commission opposes the motion.  (Doc. No. 99.)

Defendants argue that the timing of prospectus delivery is of no relevance.  (Doc. No. 82 at 2.)  The Commission responds that timing of delivery of the prospectus is one of the many "facts and circumstances" the jury must consider in assessing the adequacy of Defendants' disclosures.  (Doc. No. 99 at 2.)  "Relevant evidence is anything having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  *Burlington v. News Corp.,* Civil Action No. 09-1908, 2015 WL 3439149, at *9 (E.D. Pa. May 27, 2015) (citing Fed. R. Evid. 401).  Relevant evidence is generally admissible.  Fed. R. Evid. 402.

One of the primary issues in the case is whether Defendants adequately disclosed that

they were purchasing higher-priced unit investment trusts ("UITs") when a lower-priced alternative was available.  Defendants rely on language in the prospectuses delivered to their clients after each UIT purchase to support their argument that they adequately disclosed the fact that they were buying a more expensive version of UIT.  (Doc. No. 82 at 2.)  The fact that the prospectuses were not delivered until *after* the UITs had already been purchased (but within the window for the purchases to be rescinded) is certainly relevant to adequacy of Defendants' disclosures.  The Court held as much at summary judgment, (*see* Doc. No. 67 at 17), and other courts have similarly held that all of the facts and circumstances about the applicable disclosures are relevant in determining the adequacy thereof, *see also Sec. & Exch. Comm'n v. Ambassador Advisors, LLC*, --- F. Supp. 3d ---, No. 20-cv-2274, 2021 WL 5998456, at *6 (E.D. Pa. Dec. 20, 2021) (holding that an investment advisory client "could have combined the information provided in the trade confirmations with the information in the prospectuses and determined exactly how much the client was paying in 12b-1 fees"); *Sec. & Exch. Comm'n v. Westport Capital Mkts. LLC*, 408 F. Supp. 3d 93, 101, 104–05 (D. Conn. 2019) (considering all the disclosures the defendant–investment advisers provided their clients in determining whether the defendants adequately disclosed a conflict of interest).  "Relevance is a low bar", and the timing of the prospectus delivery "undoubtedly clear[s] it."  *Phila. Workforce Dev. Corp. v. KRA Corp.*, 673 F. App'x 183, 190 (3d Cir. 2016).

Defendants also contend that evidence of the timing of delivery of these prospectuses "is highly prejudicial to the defendants, as it erroneously implies that the prospectus delivery was late and, therefore, somehow insufficient and/or in violation of the securities laws."  (Doc. No. 82 at 3.)  Federal Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R.

Evid. 403.  Evidence is unfairly prejudicial under Rule 403 if it "clouds impartial scrutiny and

reasoned evaluation of the facts."  *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 670 (3d Cir.

2002) (cleaned up).

The Court acknowledges the potential for unfair prejudice—if the jury thinks Defendants

violated the securities regulations by failing to timely deliver the prospectus, they might think

Defendants also violated the Advisers Act through their UIT purchasing practices.  However,

any risk of unfair prejudice can be minimized by a limiting instruction making clear that the

timing of the delivery of the prospectus complied with the governing regulations.  *See United*

*States v. Vosburgh*, 602 F.3d 512, 538 (3d Cir. 2010) ("Meanwhile, the risk of unfair prejudice

was low.  The District Court specifically instructed the jury that Vosburgh was not on trial for

possessing the [] pictures, and that those pictures were not illegal.  This limiting instruction

minimized any risk of unfair prejudice.").

Because evidence of the timing of prospectus delivery is highly probative of the

adequacy of the disclosures and a limiting instruction will neutralize any risk of unfair prejudice,

the Rule 403 balancing weighs in favor of permitting the Commission to introduce evidence

about the timing of prospectus delivery.  Accordingly, Defendants' motion to preclude evidence

of and references to the timing of prospectus delivery is denied.[1]

### 2.      Motion to Preclude the Commission from Introducing Irrelevant Brokerage Account Documents

Defendants seek to preclude account statements for brokerage accounts held by

Mr. McDermott's wife, Kathleen McDermott, and Mr. McDermott's son, David McDermott,

arguing these statements are not relevant, confusing, and prejudicial.  (Doc. No. 83 at 1–2.)  The

---

[1] The Court intends to instruct the jury that the prospectus delivery complied with the governing regulations.  The parties may submit a draft limiting instruction for the Court to consider by June 30, 2022.

4

Commission opposes the motion; however, it only sets forth arguments as to Mrs. McDermott's brokerage account statements.[2]  (Doc. No. 100.)

First, Defendants argue the statements are irrelevant because they are for brokerage accounts held with MIS, not for advisory accounts held with MIA, and only MIA's UIT purchasing practices for its advisory clients are at issue in this case.  (Doc. No. 83 at 4.)  In response, the Commission offers a multi-step line of reasoning why the account statements are relevant:  (1) These MIS brokerage account statements demonstrate that Mrs. McDermott and David McDermott purchased standard UITs (the same UITs Defendants purchased for MIA's advisory clients); (2) every investor who purchased these UITs received the same prospectus, regardless of whether they were an advisory client or a brokerage client; (3) the Commission presented Mrs. McDermott with the prospectus at her deposition and asked her to identify where the prospectus disclosed that standard UITs bore transactional sales charges; and (4) Mrs. McDermott was unable to do so, but testified that it was "probably hidden in there somewhere."  (Doc. No. 100 at 3–4.)

Mrs. McDermott's brokerage account statements clear the low bar for relevance but are admissible only if not barred by Rule 403.  The Court recognizes that Mrs. McDermott is a sophisticated investor—she is the Managing Director of MIA, holds a Series 65 license, and is an Investment Adviser Representative.  The fact that someone with such experience appears unable to make sense of the prospectus unquestionably goes to the adequacy of Defendants' disclosures. *See Westport Capital*, 408 F. Supp. 3d at 104 (illustrating that a client's interpretation of

---

[2] The Commission did not offer any argument as to how David McDermott's account statements could be relevant.  Accordingly, the Court finds the Commission has waived any argument on the admissibility of Mr. McDermott's son's David McDermott's account statements.  And even if the Commission had raised such argument, the Court finds that David McDermott's account statements are not relevant.  At the time the UIT purchases were made David McDermott was a minor.  Moreover, David McDermott is not being called as a witness at trial.

disclosures is relevant to the adequacy thereof).  But the Commission need not introduce

Mrs. McDermott's brokerage account statements in order to illustrate this fact, and her account

statements are only marginally probative.  The Commission can examine Mrs. McDermott on the

contents of the UIT prospectuses in her capacity as a Managing Director for MIA.  *See United

States v. Cunningham*, 694 F.3d 372, 388 (3d Cir. 2012) (holding that the probative value of

evidence is diminished where the facts shown in the evidence had "already been established"

through other avenues).

      And the Court finds that these marginally probative brokerage account statements are

highly likely to confuse and mislead the jury.  Mrs. McDermott purchased UITs through MIS,

the broker-dealer, not through MIA.  Mrs. McDermott was not paying an advisory fee and had

no choice but to purchase standard version UITs.  (*See* Doc. No. 46-1 at 8 (explaining that the

lower-cost, fee-based UITs are available only to fee-paying advisory clients).)  The distinction

between MIS and MIA is admittedly confusing and one the parties will have to take care to avoid

confusing the jury.  Introducing Mrs. McDermott's *brokerage* account statement from MIS

would only serve to further muddy the waters between the two entities and likely confuse the

jury.[3]

      On balance, given the Commission can present the evidence it seeks to introduce without

admitting Mrs. McDermott's brokerage account statements, the Court finds that the limited

probative value of the account statements is substantially outweighed by the danger of unfair

prejudice, confusing the issues, and misleading the jury.  Accordingly, Defendants' motion to

---

[3] Moreover, the account statements offer an inside look into Mr. McDermott's wife's and son's financial assets which may be viewed by the jury as quite substantial.  Evidence of the family's wealth may unfairly prejudice the jurors against Defendants.  *See Draper v. Airco, Inc.*, 580 F.2d 91, 95 (3d Cir. 1978) ("[J]ustice is not dependent upon the wealth or poverty of the parties and a jury should not be urged to predicate its verdict on a prejudice against bigness or wealth.").

preclude is granted.

### 3.    Motion to Preclude Evidence of Judicial and Commission Opinions

Defendants seek to preclude written opinions from courts and the Commission's

Administrative Law Judges.  (Doc. No. 84.)  These opinions illustrate, at the highest levels, the

duties an investment adviser owes his clients, including the duty to disclose conflicts of interest.

(*See id.* at 2–3.)  The Commission opposes the motion.  (Doc. No. 102.)

Defendants argue these opinions are irrelevant because they do not involve UITs.  (Doc.

No. 84 at 4.)  The Commission responds that the opinions are relevant to whether Defendants

knew or should have known that they were breaching the duties they owed their clients.  (Doc.

No. 102 at 2.)  We agree with the Commission.  Even though the opinions do not deal with UITs

specifically, the duties investment advisers owe their clients do not change from security to

security.  The duties discussed in these opinions are the same as the duties Defendants owed their

clients, so the existence of these opinions is relevant to Defendants' state of mind.  *Cf.*

*Ambassador Advisors, LLC*, No. 20-cv-2274, Doc. No. 121 ¶ 3 (holding that the existence of

Commission settlements with third parties was "relevant to the issue of Defendants' state of

mind" because they "tend[ ] to make it more likely that Defendants should have been on notice

that their . . . fee arrangement could violate the Advisers Act").

In the alternative, Defendants argue the judicial and Commission opinions should be

precluded because it is solely the Court's job to instruct the jury on the law, and, if admitted into

evidence, the opinions could confuse and mislead the jury.  (Doc. No. 84 at 5.)

"[C]ourts often exclude from evidence copies of statutes, constitutional provisions, and

decisions, which might invite the jury to substitute its own view of the law."  *United States v.*

*Bonneau*, 970 F.2d 929, 932 (1st Cir. 1992).  The First Circuit explained this principal in *United*

*States v. Anthony*, 545 F.3d 60 (1st Cir. 2008).  In *Anthony*, the defendant sought to introduce

legal materials into evidence to support his defense that he had a good-faith belief that he did not have to pay taxes. *Id.* at 66. The district court precluded that evidence but permitted the defendant to read from and summarize the legal materials. *Id.* at 66–67. In reviewing the district court's decision, the First Circuit explained that the probative value of the underlying legal materials was limited, especially given the defendant's testimony about his understanding of the materials. *Id.* at 67. But, the panel explained, the risk of confusion was "high"—it was the court's role to explain the law, and "it would be most confusing to the jury to have legal material introduced as evidence." *Id.* (citing *Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*, 391 F.3d 312, 332 n.6 (1st Cir. 2004)). Balancing the materials' limited probative value against the "high" risk of confusing the jury, the First Circuit affirmed the district court's decision to preclude the legal materials from evidence. *Id.*

The same is true here. The opinions are of limited probative value, as the Commission can establish whether McDermott was aware of the duties he owed his clients by examining him and through the expert testimony of Marti P. Murray, who will be testifying as to standards and practices in the investment adviser industry. Moreover, these legal opinions are extremely likely to confuse and mislead the jury. Although the opinions are not being offered for the purpose of instructing the jury on the law, there is a risk the jury would take them as such and apply their own distillation of the law as presented in these opinions (rather than the law as explained by the court) in deciding this case. And these opinions are likely to necessitate a series of mini trials as to the context of each decision causing undue delay at trial. Thus, the Court finds that the opinions' limited probative value is substantially outweighed by the danger of confusing and misleading the jury and causing undue delay. *See United States v. Griffith*, 663 F. App'x 446, 451–52 (6th Cir. 2016) ("[T]he district court did not commit a reversible error by precluding [the

8

defendant] from introducing a copy of the Michigan statute as a trial exhibit," as admitting the statute into evidence would "thrust the jury into a quasi-judicial role and confuse them as to their fact-finding function."); *Bonneau*, 970 F.2d at 933 (explaining that testimony about the defendant's understanding of case law was less likely to confuse the jury than written legal materials "because the jury takes no written decision into the jury room to ponder").

The Commission argues that a limiting instruction would minimize any potential confusion (Doc. No. 102 at 10), but the Court is not convinced such an instruction would be sufficient to ameliorate the confusion likely to arise from the admission of the opinions. Accordingly, the Court grants Defendants' motion to preclude the judicial and Commission opinions.[4]

### 4. Motion to Preclude Evidence and Testimony of Mr. McDermott's Ph.D. from LaSalle University

Defendants seek to preclude evidence and testimony about Mr. McDermott's Ph.D. from LaSalle University. (Doc. No. 85.) The Commission opposes the motion. (Doc. No. 101.)

In 1994, Mr. McDermott received a Ph.D. from LaSalle University in Mandeville, Louisiana. (Doc. No. 85 at 2.) He did not complete any in-person coursework, but he met with an advisor telephonically for three years and defended a dissertation on "municipal bonds as an alternative to taxation in third class municipalities in Pennsylvania." (*Id.*) In 1996, it was revealed that LaSalle's founder, James Kirk, had falsified the University's accreditation papers; Mr. Kirk later pled guilty to fraud. (*Id.*) Mr. McDermott was first alerted to the fraud in 1997

---

[4] Alternatively, Defendants argue that the opinions are inadmissible hearsay. (Doc. No. 84 at 5.) The Commission argues it is offering these opinions only to show Mr. McDermott's state of mind. (Doc. No. 102 at 6.) The Commission does not allege that Mr. McDermott read the specific opinions during the relevant time period. Without such evidence, these opinions cannot be used to show Mr. McDermott's state of mind. Accordingly, the Court also finds the opinions are inadmissible hearsay as they are being offered for the truth of the matter asserted—to show the legal principals set forth therein.

and was reimbursed (at least partially) for his tuition payments. (*See* Docs. No. 107-1, 107-2.) In a letter Mr. McDermott received in connection with his tuition reimbursement, the United States Attorney for the Eastern District of Louisiana wrote,

> The Court has not required that any student participating in the restitution return any diplomas obtained from LaSalle University. However, to avoid any more personal embarrassment and to clarify any misunderstanding, I believe it advisable for each person participating in the restitution to inform any employer and/or other party who may rely to their detriment on a degree earned from LaSalle University, that the school was not a properly accredited educational institution.

(Doc. No. 107-2 at 2.)

During the Relevant Period,[5] Mr. McDermott informed his clients that he had received a Ph.D. from "LaSalle University," used the letters "Ph.D." on his email signature, and described himself as holding a "Ph.D." from "LaSalle University" in the Forms ADV provided to MIA's clients.[6]  (Doc. No. 57-1 ¶¶ 173–75.)

At trial, the Commission plans to introduce evidence and testimony about the fact that Mr. McDermott holds himself out as having a Ph.D. from LaSalle University even though the institution was not accredited at the time he earned the Ph.D. to show that it is "more likely that his misstatements or omissions concerning Defendants' UIT fee practices were more than a simple accident or mistake."  (Doc. No. 101 at 5.)  Defendants argue that this evidence is irrelevant, is inadmissible character evidence, and is substantially more prejudicial than probative.  (Doc. No. 85 at 2.)  The Commission argues that evidence of Mr. McDermott's

---

[5] Capitalized terms not defined herein are ascribed the same meaning as in the Court's Memorandum on the Commission's Motion for Summary Judgment.  (Doc. No. 67.)

[6] This representation is especially misleading, the Commission contends, because there is another, accredited LaSalle University in Pennsylvania, less than an hour away from MIA's headquarters.  (Doc. No. 46-1 at 18.)

representations regarding his Ph.D. is relevant to whether Mr. McDermott acted with scienter in purportedly misrepresenting MIA's UIT purchasing practices.  (Doc. No. 101 at 3.)  The Commission argues this is not inadmissible character evidence because it is intrinsic to Defendants' purported failure to disclose their UIT purchasing practices, or, in the alternative, because it fits within an exception enumerated in Rule 404(b)(2).  (Doc. No. 101 at 3.)

Generally, "[e]vidence of a person's character . . . is not admissible to prove that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(a)(1). Rule 404(b)(2) provides an exception to the general rule:  evidence of other crimes, wrongs or acts may be admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  Where a party seeks to introduce evidence of a defendant's other bad acts, they ordinarily must establish that such evidence fits into the exception provided in Rule 404(b)(2); however, where the other bad act is "intrinsic" to the charged offense, it need not fall under any exception.  *United States v. Green*, 617 F.3d 233, 245 (3d Cir. 2010).  Intrinsic evidence "is admissible as part and parcel of the charged offense."  *Id.*  There are two categories of intrinsic evidence:  (1) evidence that "directly proves" the charged offense; and (2) evidence of "uncharged acts performed contemporaneously with the charged [offense] . . . that facilitate[d] the commission of the charged [offense]."  *Id.* at 248–49.

One of the central issues in this case is whether Defendants adequately disclosed their UIT purchasing practices through various disclosures, including their Forms ADV.  The Commission argues that Mr. McDermott's representations about his Ph.D. are intrinsic to the adequacy of Defendants' disclosures because the Forms ADV indicated that Mr. McDermott held a Ph.D., which "cloaked all of [the] disclosures . . . with all of the credibility that a Ph.D.

11

bestows" and facilitated his fraud.  (Doc. No. 101 at 3.)  The Court disagrees.  Mr. McDermott's

failure to fully disclose that his Ph.D. was from an unaccredited institution is not intrinsic to the

conduct on trial.  Defendants are on trial for purchasing standard UITs when a cheaper option

was available.  Whether they adequately disclosed their UIT purchasing practices is relevant to

whether Defendants complied with the Advisers Act, but unrelated disclosures that happen to

appear in the same Form ADV as some of the disclosures concerning MIA's UIT purchases are

not "part and parcel" of the conduct on trial.

The Court finds that this evidence does not fit within either category of intrinsic

evidence:  It does not "directly prove" that Defendants knowingly, recklessly, or negligently

defrauded their clients by inadequately disclosing a conflict of interest in their UIT purchasing

practices.  And, even if the failure to disclaim the legitimacy of Mr. McDermott's Ph.D. may

have made it more likely that his clients invested with him, it did not meaningfully facilitate

Defendants' practice of purchasing higher-cost UITs for their clients without disclosing any

conflicts of interest or the availability of lower-cost UITs.  *See United States v. Shelow*, Criminal

Action No. 10–0037, 2011 WL 6130974, at \*3 (E.D. Pa. Dec. 9, 2011) (holding, in a wire fraud

case, that evidence of the defendant's longstanding relationships with the victims could show

that the victims may have believed they could trust the defendant but did not "facilitate" the

fraud).  *Contra United States v. Weigand*, Nos. 5:17-cr-00556 / 5:20-cr-00248, 2021 WL

4318057, at \*4 (E.D. Pa. Sept. 23, 2021) (holding that evidence of certain calls were intrinsic to

the defendant's alleged bank and wire fraud where the calls "facilitated the charged crimes

because they allowed [the defendant] to maintain control over his client's financial accounts and

keep them in the dark as to what he was doing").

In the alternative, the Commission argues this evidence is admissible under Rule

12

404(b)(2).  (Doc. No. 101 at 4–5.)  Under Rule 404(b)(2), evidence of other bad acts may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  To introduce such evidence, the proponent must identify a proper purpose for admission and explain how the evidence is relevant to that purpose, and the court must conduct a Rule 403 balancing. Fed. R. Evid. 404(b)(2); *see also United States v. Caldwell*, 760 F.3d 267, 277–78 (3d Cir. 2014).  And such evidence is never admissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).

The Commission seeks to introduce evidence regarding Mr. McDermott's failure to disclose that his Ph.D. is from an unaccredited institution to show Mr. McDermott's "intent, knowledge, absence of mistake, or lack of accident with respect to the alleged investment adviser fraud at issue in this case."  (Doc. No. 101 at 4–5.)  To establish its claims under Sections 206(1) and (2), the Commission must show that Defendants' UIT purchasing practices violated the Advisers Act and that Defendants acted with scienter or negligently in engaging in those practices in violation of the Act.  *See* 15 U.S.C. §§ 80b-6(1), (2).  Because the claims turn on whether Defendants acted intentionally, knowingly, or negligently (i.e., in the absence of mistake or with lack of accident), their state of mind is at issue in this case.  *Contra Caldwell*, 760 F.3d at 279 ("Because the Government proceeded solely on a theory of actual possession, we hold that [the defendant's] knowledge was not at issue in the case.").

The Commission argues that evidence of Mr. McDermott's misleading references to his Ph.D. from LaSalle University "is probative of [Mr.] McDermott's state of mind with respect to the statements that he made to his advisory clients, especially given that certain of these

misleading statements . . . were in the very same Form ADV disclosures that contained

misstatements and omissions about Defendants' UIT fee practice."  (Doc. No. 101 at 5.)  The

Court does not agree.  This is textbook propensity evidence being offered only to show that

Mr. McDermott misled his advisory clients about whether he actually had a Ph.D., so he must

have also misled his advisory clients with respect to MIA's UIT purchasing practices.  The

Commission merely recites the elements for Rule 404(b)(2), and the Court is not convinced that

the purportedly inaccurate representations Mr. McDermott made regarding his Ph.D. have any

bearing on the adequacy and accuracy of separate, unrelated statements regarding MIA's UIT

purchasing practices.  The only connection that makes this evidence relevant is to show

propensity.  *See United States v. Davis*, 726 F.3d 434, 442 (3d Cir. 2013) ("In proffering such

evidence, the government must explain how it fits into a chain of inferences—a chain that

connects the evidence to a proper purpose, no link of which is a forbidden propensity

inference.").

As such, evidence of Mr. McDermott's Ph.D. from LaSalle University is inadmissible,

and Defendants' motion to preclude is granted.

### 5.    Motion to Preclude Evidence of and References to Settled Orders

Last, Defendants seek to preclude evidence of and references to:  (1) a settlement order

from a January 30, 1998 Commission enforcement action against Mr. McDermott, (2) a

settlement order from a Commission enforcement action against third parties, and (3) industry

publications.  (Doc. No. 86.)  The Commission opposes the motion.  (Doc. No. 102.)  The Court

considers each category of evidence in turn.

### i.    1998 Old Naples Settlement with Mr. McDermott

Defendants seek to preclude evidence of and references to a 1998 settlement order

between the Commission and Mr. McDermott (the "Old Naples Settlement").  (Doc. No. 86 at

2.)  In 1998, the Commission commenced an enforcement action against Old Naples Securities, Inc., a broker-dealer, for failing to investigate red flags in an investment that turned out to be a Ponzi scheme.  (*Id.*)  Defendants argue that the Old Naples Settlement is irrelevant and that the Commission wants to introduce testimony of it solely to characterize Mr. McDermott as "a recidivist violator of the securities laws likely to have engaged in the alleged acts at issue."  (*Id.*) We agree with Defendants.

The Old Naples Settlement is not relevant to whether Defendants' UIT purchasing practices violated the Advisers Act.  Mr. McDermott did not enter into this settlement in his capacity as an investment adviser, and the settlement has nothing to do with UITs or disclosures. (*Id.*)  The fact that Mr. McDermott may have missed some red flags in an investment *24 years ago* has no bearing on whether he failed to disclose a purported conflict of interest, act in his clients' best interest, or obtain best execution in 2013 and 2014.  Relevance is a low bar, but evidence of the 1998 Old Naples Settlement does not clear it.  *See Binkley v. Brueninger*, Civil No. 1:CV–10–01245, 2014 WL 1308911, at \*1 (M.D. Pa. Mar. 31, 2014) (holding that evidence of "misconduct reports unrelated to the incident" were irrelevant and "would likely cause confusion of the issues").

Even if the Old Naples Settlement were relevant, the Commission has not identified a non-propensity purpose for which it is being offered.  The only reason the Commission would want to introduce evidence of the Old Naples Settlement is to show that Mr. McDermott was subject to an enforcement action before, so it is more likely that he committed the wrongdoing alleged in this enforcement action.  This is textbook propensity evidence, and it is not admissible. *See Lopez v. City of Lancaster*, CIVIL ACTION NO. 5:19-cv-05104-KSM, 2021 WL 5279880, at \*7 (E.D. Pa. Nov. 12, 2021) (holding that evidence of the defendant's interactions with non-

parties was inadmissible character evidence because that evidence "would only be offered to show that he has a propensity for using excessive force").

Accordingly, Defendants' motion to preclude evidence of and testimony about the Old Naples Settlement granted and the Commission is precluded from asking Mr. McDermott if he violated securities laws and regulations in the past.

### ii.    Third-Party Settlement

Defendants also seek to preclude evidence of the Commission's settlement with nonparty investment advisers who purchased mutual fund shares for their clients that bore a fee even though otherwise identical shares were available without the fee.[7]  (Doc. No. 86 at 4.) Defendants argue that this settlement is irrelevant because "SEC settlements are not binding precedent."  (Doc. No. 86 at 4.)  The Commission argues that the settlement is relevant because it should have put Defendants on notice that the Commission was pursuing enforcement actions against investment advisers for purchasing higher-cost investment vehicles when otherwise identical, lower-cost investments were available.  (Doc. No. 102 at 8.)

We agree that the settlement is relevant.  Had Defendants reviewed this settlement, it is more likely that they would have recognized that they could have been breaching their fiduciary duty through their UIT purchasing practices (which are arguably analogous to the conduct charged in the settled action).  *Cf. Grosek v. Panther Transp., Inc.*, No. 3:07cv1592, 2009 WL 905035, at *6 (M.D. Pa. Apr. 1, 2009) (holding that information about how the defendants' safety practices compared with "industry norms and government standards" was relevant to whether the defendants acted negligently).

---

[7] Defendants do not object to the admissibility of the settled order in *In re Sarkauskas and Associates, Inc.*, 107 S.E.C. 644 (Sept. 13, 2013),which dealt specifically with the same UIT transactions at issue in this case.  (Doc. No. 86 at n.3.)

But even though the settlement order is relevant, it is likely to confuse the jury.  It looks like a judicial opinion, reads like a judicial opinion, and recounts the law (including the law on Section 206 and the fiduciary duty investment advisers owe their clients) like a judicial opinion. (*See generally* Trial Ex. 82.)  As discussed above, *see supra* Section A.3, "courts often exclude from evidence copies of statutes, constitutional provisions, and decisions, which might invite the jury to substitute its own view of the law," *Bonneau*, 970 F.2d at 932–33.  To the extent that the settlement is relevant to Defendants' state of mind, the Commission is permitted to ask Mr. McDermott whether he was aware of it, but to avoid the risk of confusing the jury, the Court will not permit this settlement order to be introduced as evidence.

### iii.   Industry Publications

Last, Defendants seek to preclude a notice from the National Association of Securities Dealers ("NASD") regarding UITs and newsletters from the Financial Industry Regulatory Authority ("FINRA") announcing fines against third parties for their trading practices.  (Doc. No. 86 at 4–5.)  They argue that these publications are irrelevant because the acts discussed in the newsletters differ from the conduct at issue in this trial.  (*Id.*)  The Commission contends that the conduct discussed in the newsletters is similar enough to the conduct on trial that the newsletters could have put Defendants on notice that they were acting differently than would a reasonable investment adviser in the same circumstances.  (Doc. No. 102 at 9–10.)

We agree with Defendants.  At the highest levels, the industry publications go to show that broker-dealers must get their clients the best deal available on UIT purchases, but the specifics of the conduct discussed in these publications differ greatly from the conduct for which Defendants are on trial.[8]  And any relevance (which, again, is minimal) is substantially

---

[8] The relevance of these publications is further diminished by the fact that the conduct discussed therein involved broker-dealers, not investment advisers.  (*See, e.g.*, Exs. 85–88.)

outweighed by the risk of confusing the issues, misleading the jury, undue delay, and wasting time.  These publications discuss price breaks, breakpoint discounts, and trades on the margin; all of these concepts are complicated, and none are at issue in this case.  Were these publications introduced into evidence, the parties would have to spend valuable trial time explaining various terms of art (such as "breakpoint discount") and differentiating the conduct discussed in the publications from Defendants' conduct at issue here.  This is a complicated case with complicated facts.  We need not further obscure the case by admitting highly technical industry publications that are not directly on point.  *See Oliver v. Ingber*, No. CIV.A. 96–4471, 1998 WL 107299, at \*3 (E.D. Pa. Mar. 9, 1998) ("[W]hat little relevancy contained in Mr. Dick's testimony was outweighed by its prejudicial value under Rule 403 of the Federal Rules of Evidence because it would be confusing to the jury and would introduce to the jury evidence that was very complicated and somewhat remote and attenuated.  The Court did allow, however, testimony by Mr. Dick on a limited issue that the Court found was put at issue by the testimony of Defendants.").

Accordingly, Defendants' motion to preclude evidence of and testimony about industry publications is granted.

### B.     *The Commission's Motions in Limine*

The Commission also filed five motions *in limine*.  It seeks to preclude testimony containing legal conclusions and misstating the law concerning an investment advisers' duty to act in his clients' best interests to seek best execution; evidence of examinations by FINRA and the Florida Office of Financial Regulation ("OFR"); argument, testimony, or other evidence relating to internal Commission communications or the Commission's examination; and argument, testimony, or other evidence relating to events occurring after the Relevant Period.

18

(Docs. No. 87–90.)  The Commission also seeks to treat certain witnesses as adverse parties.
(Doc. No. 91.)  Defendants oppose the motions.  (Docs. No. 94–98.)  The Court addresses each
motion in turn.

> **1.     Motion to Preclude Testimony Containing Legal Conclusions and
> Misstating the Law Concerning an Investment Adviser's Duty to Act
> in Clients' Best Interests and to Seek Best Execution**

The Commission seeks to preclude testimony that Defendants acted in their clients' best
interest or obtained best execution through their UIT purchasing practices.  (Doc. No. 87.)
Defendants oppose the motion.  (Doc. No. 96.)

First, the Commission seeks to preclude evidence, argument, and testimony that
Defendants thought they were acting in their clients' best interest or attempted to achieve best
execution through MIA's comprehensive fee structure.  (Doc. No. 87 at 4–6.)  Throughout this
case, Defendants have argued that they acted in their clients' best interest and obtained best
execution by providing a comprehensive fee structure:  they purchased higher-cost, standard
version UITs for their advisory clients, and in exchange, MIS provided cost-free equity trades.
(Doc. No. 96 at 3.)  Defendants claim that, on the whole, this arrangement benefitted MIA's
advisory clients.  (*Id.*)  The Commission argues that evidence of MIA's comprehensive fee
structure is irrelevant because best interest and best execution are measured on a transaction-by-
transaction basis, not based on the client–adviser relationship as a whole.[9]  (Doc. No. 87 at 4.)  In

_____

[9] In its briefing on the motion *in limine*, the Commission cites a litany of cases for the principal
that best interest and best execution are measured on a transaction-by-transaction basis without viewing
the nature of the relationship as a whole.  (*See, e.g.*, Doc. No. 87 at 5.)  For example, the Commission
cites to *In re Dennis J. Malouf*, SEC Release No. 4463, 2016 WL 4035575, at \*18 (2016) for the principal
that "best execution requires an investment adviser to execute securities transactions for clients in such a
manner that the client's total costs or proceeds *in each transaction* is the most favorable under the
circumstances."  (Doc. No. 87 at 5.)  But the Commission overlooks the fact that the same release—in the
same paragraph—says that the "determinative factor" for best execution is "whether the transaction
represents the best qualitative execution *for the managed account*."  *In re Dennis J. Malouf*, 2016 WL
4035575, at \*18; *see also Malouf v. Sec. & Exch. Comm'n*, 933 F.3d 1248, 1264 (10th Cir. 2019) ("[The
duty of best execution] requires investment advisers to seek the lowest price reasonably available for a

response, Defendants argue that this evidence is relevant because best interest and best execution are measured more holistically.  (Doc. No. 96 at 5.)

The Court agrees with Defendants.  At summary judgment, we held that a reasonable jury could find that Defendants acted in their clients' best interest and achieved best execution given the benefits from MIA's comprehensive fee structure.  (Doc. No. 67 at 18–19.)  Because best interest and best execution are not to be viewed in a vacuum and there are relevant considerations other than just price, Defendants may offer testimony, arguments, and evidence about MIA's comprehensive fee structure.

The Commission also seeks to preclude Mr. McDermott from testifying that he was acting in his clients' best interest and was achieving best execution.  (Doc. No. 87 at 3.)  It argues that such testimony is an improper legal conclusion.  (*Id.*)  We agree with the Commission that testimony that Mr. McDermott *was* acting in his clients' best interest or that he *was* achieving best execution would be an impermissible legal conclusion.  But testimony that Mr. McDermott *thought he was* acting in his clients' best interest or *thought he was* achieving best execution is not a legal conclusion.  It is a factual averment that goes directly to one of the central issues in this case—Mr. McDermott's state of mind.  There is little risk that the jury would be misled by testimony to this effect; rather than viewing such statements as legal conclusions, they will view them, properly, as factual averments and weigh them (and Mr. McDermott's credibility) against the other evidence presented at trial in considering whether the Commission proves its claims.  And to obviate such risk, the Court will provide the jury with a limiting instruction that the Court—not any witness or counsel—instructs the jury on the law.

In sum, the Commission's motion is granted in part and denied in part.  The motion is

client unless the more expensive option results in better *service*." (emphasis added)).

denied insofar as Defendants will be permitted to introduce evidence and elicit testimony regarding other benefits their advisory clients received in exchange for the higher-priced UITs. The motion is granted to the extent that Mr. McDermott will not be permitted to testify as to legal conclusions, but Mr. McDermott may testify as to whether he *thought* he acted in his clients' interest and achieved best execution.

### 2.    Motion to Preclude Evidence of Examinations by FINRA and the Florida OFR

Next, the Commission seeks to preclude evidence of examinations conducted by FINRA and the Florida OFR.  (Doc. No. 88.)  Defendants argues that these examinations are not relevant and would be unfairly prejudicial and risk misleading the jury.  (*Id.* at 4.)  Defendants oppose the motion.  (Doc. No. 95.)

In 2013, FINRA conducted an examination of broker-dealer MIS and flagged no issues concerning UITs.  (*Id.* at 2.)  Defendants argue that evidence of this examination is relevant because the fact that FINRA did not flag any issues regarding *MIS*'s UIT purchasing practices shows that Defendants had no reason to believe there was any issue with *MIA*'s UIT purchasing practices.  (Doc. No. 95 at 5.)  But FINRA did not flag any issues with MIS's UIT purchasing practices because it did not examine those practices—it reviewed only the "Suitability of 529 Plan Recommendations" and "IRC 1031 Tenants-In-Common Exchanges."[10]  (Doc. No. 88 at 4.)  Accordingly, the 2013 FINRA examination would not have given Defendants any comfort about

---

[10] Defendants suggest the 2013 FINRA examination is relevant because McDermott discussed MIA's and MIS's UIT trading practices with someone from FINRA during a 2011 examination.  (Doc. No. 95 at 3.)  A conversation in a 2011 examination does not render the 2013 FINRA examination, which did not discuss UITs, relevant.

Notwithstanding this ruling, the Court acknowledges that discussions McDermott had in connection with the 2011 FINRA examination, including about MIS's UIT purchasing practices, and the fact that McDermott memorialized a service agreement between MIS and MIA following those discussions are relevant to the issues on trial.

the propriety of their UIT purchasing practices, and it is not relevant to their state of mind.[11]

Separately, OFR conducted an examination of MIA for the time period from July 1, 2013 through March 31, 2014. (*Id.* at 3.) OFR did not raise any issues with MIA's UIT purchasing practices for its advisory clients. (Doc. No. 95 at 5–6.) The Commission argues that evidence of OFR's examination is irrelevant because OFR did not send MIA the findings from its examination until after the Relevant Period, so the fact that OFR raised no red flags regarding MIA's UIT purchasing practices had no bearing on Defendants' state of mind during the relevant period. (Doc. No. 88 at 5.)

We agree that the OFR findings are not relevant to whether Defendants acted with scienter during the Relevant Period; however, the fact that OFR raised no issues with MIA's UIT purchasing practices could go to show that Defendants did not act negligently. The fact that one of the regulators examining MIA took no issue with MIA's UIT purchasing practices may show that Defendants' conduct was in line with that of a reasonable investment adviser.[12] *Cf. Ambassador Advisors*, Doc. No. 121 ¶ 7(e) (explaining that evidence of the Commission's investigation into an investment adviser during a period when the adviser was not engaging in the purportedly wrongful conduct was not relevant to the adviser's state of mind). Additionally, evidence of the OFR examination is not barred by Rule 403, as the Court will provide the jury with a limiting instruction that OFR's findings have no bearing on whether Defendants' UIT purchasing practices actually complied with the Advisers Act to minimize any potential for

---

[11] The Commission also argues that evidence of FINRA's examination into MIS is irrelevant because MIS's conduct is not at issue—MIA's is. The Court finds this argument disingenuous, as the Commission well knows that the issues in this case all began based on information the Commission obtained *during an examination of MIS*. Evidence of examinations of MIS is not *per se* irrelevant.

[12] The Court has considered the Commission's argument that OFR may not have made any findings regarding MIA'S UIT purchasing practices because it was aware the Commission was investigating those practices. (Doc. No. 88 at 5.) This argument calls for speculation and is inadmissible.

unfair prejudice.

In sum, the Commission's motion is granted as to the FINRA examination and denied as to the OFR examination.

### 3.   Motion to Preclude Argument, Testimony, or Other Evidence Relating to Internal Communications or the Examination Process

The Commission seeks to preclude argument, testimony, and other evidence relating to the Commission's internal communications and the Commission's examination process as irrelevant and substantially more prejudicial than probative.  (Doc. No. 89.)  Defendants oppose the motion, arguing that the Commission's internal communications go to show Defendants' state of mind.  (Doc. No. 94 at 4–5.)  As discussed above, this case turns on (1) whether Defendants breached the fiduciary duty they owe their advisory clients; and (2) whether they acted with scienter or negligently in doing so, so any evidence that goes to show Defendants' state of mind with respect to their UIT purchasing practices (and the disclosures about their UIT purchasing practices) would be relevant.

The Commission has identified four categories of internal communications, documents, and other correspondence about its investigation of MIS that it seeks to preclude.  (Doc. No. 89 at 5.)  The Court considers the relevance of each category of documents in turn.

#### i.   Internal Correspondence

The Commission seeks to preclude evidence, testimony, and argument about emails between Commission staff and supervisors regarding the Commission's examination of MIS.  (*Id.*)  These documents demonstrate whether the Commission actually thought Defendants' UIT purchasing practices violated the securities laws during the relevant period, which is relevant to whether Defendants acted negligently.  Whether Defendants acted negligently turns on whether they acted as a reasonable investment adviser would act in the same circumstances.  *See*

*Westport Capital*, 408 F. Supp. 3d at 107 ("Negligence is the failure to 'exercise reasonable care under all the circumstances.'" (quoting *Robare Grp., Ltd. v. Sec. & Exch. Comm'n*, 922 F.3d 468, 477 (D.C. Cir. 2019)).  The fact that the Commission itself—the regulatory body charged with policing the investment adviser industry—may not have thought Defendants' conduct untoward is relevant to whether Defendants acted reasonably.  *See Ambassador Advisors*, Doc. No. 121 ¶ 7(d) (denying the Commission's motion *in limine* to preclude evidence of the Commission's investigation into an investment adviser during the period the adviser was engaged in the allegedly wrongful conduct, as such evidence "tends to show that [the advisers] were not on notice that their 12b-1 fee arrangement violated the Advisers Act, which in turn suggests that [the advisers] were not at least negligent").

Accordingly, evidence of the Commission's internal correspondence regarding its examination of MIS is admissible.

### ii.   Internal Notes from and Memoranda Regarding MIS Examination

Next, the Commission seeks to preclude evidence, testimony, and arguments about internal notes from and memoranda about the Commission's examination of MIS.  (Doc. No. 89 at 5.)  Much like the internal correspondence, the Commission's real-time observations of MIS may demonstrate that the Commission did not initially identify any issue with Defendants' UIT purchasing practices, which could go to show that a reasonable investment adviser would also engage in such practices and Defendants did not act negligently.

### iii.   The Examination Findings Letter

The Commission also seeks to preclude evidence, testimony, and arguments about the letter it sent Mr. McDermott on January 6, 2015 with findings from the examination of MIS.  (*Id.* at 6.)  The Commission argues the letter has no bearing on Defendants' state of mind because it

24

was sent *after* the Relevant Period.  (*Id.*)  Defendants argue the letter is relevant to their state of

mind because they stopped the disputed UIT purchasing practices immediately upon receipt of

the letter.  (Doc. No. 94 at 4.)

We agree with Defendants.  Even though this letter was sent after the Relevant Period, it

is relevant to whether Defendants acted with scienter.  *See United States v. Greenlee*, 517 F.2d

899, 903 (3d Cir. 1975) ("Defendant contends that any evidence respecting events after the due

dates for the filing of returns for the respective years is irrelevant to the crucial question of his

state of mind at the time he failed to make the required returns.  We reject this contention.");

*Patrick v. Patrick*, No. 2:08cv450, 2010 WL 569740, at *2 (W.D. Pa. Feb. 12, 2010) ("The

proposition that a subsequent event can never be probative of an individual's state of mind . . . is

an axiom without foundation.  Instead, each piece of evidence must be analyzed for probative

value . . . .").  The fact that Defendants stopped the disputed conduct as soon as they received the

letter may go to show that they were not intentionally or knowingly breaching their fiduciary

duty.

The Commission also seeks to preclude the earlier drafts of its findings letter, arguing

that these drafts are "of no consequence to any issue in dispute."  (Doc. No. 89 at 6.)  A close

examination of the drafts shows that they are not materially different than the final version sent

to Mr. McDermott in January 2015 (at least in the section regarding UITs).[13]  As such, these

drafts may be cumulative; however, the Court will wait to see how Defendants seek to introduce

---

[13] The only change from the first draft to the second draft is the addition of a reference to FINRA
Rule 2010, which "requires members to act in an honorable and just way when conducting securities
transactions with customers."  (*Compare* Ex. 331 at 5 *with* Ex. 332 at 5.)  The final version removes the
reference to FINRA Rule 2010 and finds that Defendants' UIT purchasing practices violated only FINRA
Rule 2111, which "requires that a member or an associated person have a reasonable basis to believe that
a recommended transaction or investment strategy involving a security or securities is suitable for a
person."  (*See* Ex. 338 at 6.)

these exhibits as evidence to make its determination.  *See United States v. Faust*, 850 F.2d 575, 586 (9th Cir. 1988) ("Although the evidence may be relevant in light of the fact that Faust was allowed to testify to all the facts contained in the letter, the draft itself was cumulative and its probative value slight."); *Amgen Inc. v. Hospira, Inc.*, 336 F. Supp. 3d 333, 355 (D. Del. 2018) (holding that draft guidance would have been cumulative of other evidence of regulatory uncertainty); *cf. Bernard v. E. Stroudsburg Univ.*, 700 F. App'x 159, 167–68 (3d Cir. 2017) (holding that an interim report was inadmissible at trial because its lack of finality rendered it untrustworthy).  The Court notes that even if the drafts are excluded from being introduced as exhibits, the Court will permit Defendants to question Mr. Fowler about the fact drafts were prepared and the timing of these drafts.

iv.   <u>Examination Information to Broker-Dealers</u>

Last, the Commission seeks to preclude evidence, testimony, and argument about a form entitled "Examination Information for Broker Dealers" that it provided to educate broker-dealers on the examination process.  (Doc. No. 89 at 6.)  The Commission argues this form is irrelevant because it is "outdated" and does not accurately reflect the policies in place at the time of the MIS examination.  (*Id.*)  Defendants contend that the Commission provided this document in discovery and cannot now dispute its relevance.  (Doc. No. 94 at 6.)

The scope of relevance at discovery is far broader than the scope of relevance at trial; documents that are relevant for discovery purposes are not necessarily admissible at trial. *Mazzoni v. Schindler Elevator Corp.*, Civil Action No. 3:CV-11-1153, 2013 WL 74373, at *2 (M.D. Pa. Jan. 4, 2013) ("[T]he broad scope of information permitted during the discovery process is clearly distinct from the evidence which is later found to be relevant and admissible at trial.").  Contrary to Defendants' arguments, the fact that the Commission produced this form

26

during discovery does not automatically render it relevant at trial.  Mark Fowler, the line

accountant who conducted the examination of MIS, testified at his deposition that the policies

and procedures laid out in this form were not in effect at the time of the MIS examination.  (Doc.

No. 89 at 6.)  To the extent these policies and procedures were not in effect at the time of the

MIS examination, they are not relevant and will be excluded.  But the Commission must turn

over the policies and procedures that were in effect from the beginning of the Relevant Period

through January 2015 (the date the Commission sent the deficiency letter).  These policies and

procedures are relevant and admissible.  And Defendants may examine Mr. Fowler on the

policies that were in effect at that time.

*        *        *

In sum, the Court finds the internal correspondence, memoranda, and notes, the

examination findings letter, and the policies and procedures in effect during the Relevant Period

are relevant.  The Commission still argues that even if the Court finds this evidence is relevant, it

should be excluded under Rule 403.  The Commission contends the evidence "will confuse the

jury about what issues are relevant to its decision, would unfairly prejudice the SEC, and could

unnecessarily delay the trial."  (Doc. No. 89 at 4.)  But, as explained above, this evidence is all

probative Defendants' state of mind, and there is no reason to think Defendants will introduce

this evidence for any reason other than to show that they did not act negligently or with scienter.

Any potential prejudice to the Commission is not unfair and certainly does not substantially

outweigh the probative value of this evidence, so there is no basis to exclude this evidence.[14]

For these reasons, the Commission's motion to preclude evidence, testimony, and

---

[14] The Court acknowledges the Commission's concern that Defendants may attempt to hold a mini trial on the examination process.  The Court warns Defendants not to do so; if they do, the Commission may renew its relevance and Rule 403 objections at trial.

argument about the internal correspondence, memoranda, and notes, and examination findings letter is denied.  The Commission's motion is granted only as to the "Examination Information to Broker Dealers" form not in effect at the Relevant Period; however, the policies and procedures in effect must be produced to Defendants immediately and will be admissible at trial.

### 4.      Motion to Preclude Argument, Testimony, or Other Evidence Relating to Events Occurring After the Relevant Period

The Commission seeks to preclude argument, testimony, and other evidence of any event that occurred after the Relevant Period.  (Doc. No. 90.)  Other than its January 2015 deficiency letter to Mr. McDermott, the Commission does not specifically identify the evidence it seeks to preclude; rather, it seeks a blanket order precluding any and all evidence from after the Relevant Period on the ground that any such evidence is necessarily irrelevant to Defendants' state of mind during the Relevant Period.  (*Id.* at 2.)

The Third Circuit has made clear that evidence of events that took place after the alleged wrongful conduct can be relevant to the defendant's state of mind at the time of the alleged wrong.  *See Greenlee*, 517 F.2d at 903 ("Defendant contends that any evidence respecting events after the due dates for the filing of returns for the respective years is irrelevant to the crucial question of his state of mind at the time he failed to make the required returns.  We reject this contention."); *see also Patrick*, 2010 WL 569740, at *2 ("The proposition that a subsequent event can never be probative of an individual's state of mind . . . is an axiom without foundation. Instead, each piece of evidence must be analyzed for probative value . . . .").  This is the case here.  As discussed above in connection with other motions *in limine*, certain after-the-fact evidence is relevant to Defendants' state of mind during the Relevant Period.  For instance, the fact that Defendants stopped purchasing UITs immediately upon receiving the Commission's letter challenging their UIT purchasing practices is relevant to whether they acted with scienter.

Similarly, the fact that MIA received a letter from OFR after the Relevant Period that did not raise issues with its UIT purchasing practices during the Relevant Period is also relevant to whether Defendants acted negligently.

Given the relevance of certain after-the-fact evidence, the Court declines to issue a blanket order precluding all such evidence. To the extent the Commission takes issue with specific evidence of events after the Relevant Period not discussed herein, it may renew this motion at trial.[15]

### 5. Motion to Treat Certain Witnesses as Hostile Witnesses

Finally, the Commission seeks to treat Mr. McDermott, Kathleen McDermott, Bruce Downing, Charles Bowers, and Daniel Nemeth, all of whom own or are employees of MIA or MIS, as hostile. (Doc. No. 91.) It argues that Mr. McDermott, an adverse party, and the other witnesses, adverse party affiliates, are biased against—and thus unlikely to cooperate with—the Commission. Defendants oppose the motion on the ground that "it is premature for the SEC to request carte balance authority to ask leading questions of all five of these witnesses." (Doc. No. 98 at 5.) We agree with Defendants. At this juncture, the motion is premature. If, at trial, any of these witnesses stonewall the Commission or otherwise act with hostility, the Commission may renew its motion.

The Commission also seeks to preclude Defendants from asking these five witnesses leading questions. (Doc. No. 91 at 4.) And Defendants appear to concede this point, stating that "Defendants generally do not take issue with the request that they not be permitted to ask leading questions of [those witnesses]." (Doc. No. 98 at 2). Accordingly, the Court grants the

---

[15] The Court acknowledges this ruling will affect the scope of the Commission's examination of Dr. Dennis Hamilton. The Commission may examine Dr. Hamilton on certain events following the Relevant Period consistent with the proffer at *voir dire* on June 23, 2022.

Commission's motion as to this aspect and agrees that Defendants will not be permitted to lead the five witnesses identified.[16]

### C.    Conclusion

For the reasons above, Defendants' motions *in limine* are granted in part and denied in part, and the Commission's motions *in limine* are granted in part and denied in part.  An appropriate Order follows.[17]

---

[16] Even without this concession, the Court would have been inclined to bar Defendants from asking leading questions to witnesses biased in their favor.  "Ordinarily, the court should allow leading questions on cross examination."  Fed. R. Evid. 611(c)(1).  However, "[w]here the witness is biased in favor of the cross-examiner, the same danger of leading questions arises as on direct, and the court may, in its discretion, prohibit their use."  *See United States v. McLaughlin*, No. Crim. 95-113, 1996 WL 555269, at *3 (E.D. Pa. Aug. 30, 1996) (quoting Weinstein & Berger, *Evidence*, 611–84 (1988)); *see also In re Asbestos Prods. Liab. Litig.*, CIVIL ACTION NO. 09-90809, 2011 WL 13377927, at *3 n.2 (E.D. Pa. May 10, 2011) (explaining that Rule 611 includes the word "ordinarily" "to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact, as for example the 'cross-examination' of a party by his own counsel after being called by the opponent (savoring more of re-direct)").

[17] The accompanying Order also rules on the admissibility of all objected-to trial exhibits.