IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | CIVIL ACTION |
| Plaintiff, | NO. 19-4229-KSM |
| *v.* | |
| DEAN PATRICK MCDERMOTT, et al., | |
| Defendants. | |

## MEMORANDUM

**MARSTON, J.**                                                                                    **October 28, 2022**

Defendant Dean Patrick McDermott owns and operates an investment advisory firm, Defendant McDermott Investment Advisors, LLC ("MIA").  (Doc. No. 104, Att. B ¶ 1.)  From 2013 through 2014, Defendants purchased certain securities for their clients that bore transaction fees even though those clients were eligible to purchase essentially identical securities for no fee. (*Id.* ¶¶ 76–81.)  A portion of the transaction fees paid on those securities went to Relief Defendant McDermott Investment Services, LLC ("MIS"), a broker-dealer wholly owned by Mr. McDermott.  (*Id.* ¶ 86.)

Approximately four and a half years after sending a deficiency letter to Defendants, the U.S. Securities and Exchange Commission (the "Commission") commenced this enforcement action against Defendants, alleging that their conduct violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 and that Mr. McDermott aided and abetted MIA's alleged violations in violation of Section 209(f) of the Advisers Act.  (*See* Doc. No. 1.)  On July 12, 2022, a jury found that MIA and Mr. McDermott's conduct violated Sections 206(1) and Section 206(2) and that Mr. McDermott aided and abetted MIA's violations in violation of Section

209(f).  (Doc. No. 139.)

The Commission now moves for entry of final judgment against Defendants and Relief

Defendant MIS, seeking a permanent injunction against MIA and Mr. McDermott, disgorgement

of $143,379.33, prejudgment interest of $50,983.60, and civil penalties against MIA and

Mr. McDermott in the amounts of $400,000 and $80,000, respectively.  (*Id.*)  Defendants and

Relief Defendant contend that "the remedies the [Commission] seeks are excessive,

impermissibly punitive, and disproportionate to the conduct those remedies are supposed to

address."  (Doc. No. 152 at 6.)  For the reasons below, the Commission's motion is granted in

part and denied in part.

## I.    BACKGROUND

### A.    *Factual Background*

The Court provides a brief overview of the factual background, focusing on those facts

most relevant to the instant motion.  The Court's Memorandum on the motion for summary

judgment provides a more detailed overview of all the facts giving rise to this action.

#### 1.    MIA's Business Structure

Mr. McDermott is the sole owner and managing member of both MIA and MIS.  (Doc.

No. 104, Att. B ¶ 1.)  MIA was a federally registered investment adviser from September 2006

through September 2012 and has been a federally registered investment adviser since April

2014.[1]  (*Id.* ¶ 3.)  MIS has been a registered broker-dealer since 2011.  (*Id.* ¶ 5.)  As an

investment adviser, MIA is regulated by the Commission, and as a broker-dealer, MIS is

regulated by the Financial Industry Regulatory Authority ("FINRA").  (*Id.* ¶¶ 3, 5.)

---

[1] MIA was a state-registered investment adviser from September 2012 through April 2014.  (Doc. No. 104, Att. B ¶ 3.)

MIA provides clients with investment advice in exchange for a fee that is based on a percentage of the clients' assets under management.  (*Id.* ¶ 10.)  The standard fee scale ranged from one to two percent of assets under management depending on the size of a client's account; however, the fee was often negotiated to a lower amount.  (*Id.* ¶ 11.)  From March 2013 to December 2014 (the "Relevant Period"), MIA advised between 100 and 350 clients, most of whom were individual retail investors.  (*Id.* ¶ 4.)  And from 2012 to 2015, MIA had between $50 million and $165 million in assets under management.  (*Id.*)  Mr. McDermott and MIA had discretion over certain of their clients' advisory accounts and were authorized to make investment decisions for these advisory clients without prior notification or approval.  (*Id.* ¶ 12.) Mr. McDermott made the final decisions relating to investments in MIA discretionary client accounts.  (*Id.* ¶ 14.)

### 2.  MIA's UIT Purchasing Practices

A Unit Investment Trust ("UIT") is an investment product where the sponsor chooses a portfolio of securities and deposits them into a trust that terminates after a set period of time.  (*Id.* ¶ 15.)  UITs typically hold individual stocks or bonds, or a combination or both.  (*Id.*)  During the Relevant Period, Mr. McDermott and MIA purchased UITs on behalf of 166 discretionary advisory accounts.  (*Id.* ¶¶ 16, 76.)

The UITs Defendants purchased for their clients were available in standard and fee-based versions.  (*Id.* ¶ 78.)  The only material difference between the standard and fee-based versions is the fee structure:  the standard version bears a transactional sales charge, but the fee-based version does not.  (*Id.* ¶ 80.)  MIA's clients were eligible for the lower-cost, fee-based version of UITs, but MIA always purchased the more expensive, standard version for its clients.  (*Id.* ¶¶ 81–82.)  Throughout the Relevant Period, MIA caused its clients to incur nearly $160,000 in transactional sales charges by purchasing standard, rather than fee-based, UITs.  (*Id.* ¶ 86.)  Of

3

the fees incurred, approximately $143,379.33 went to MIS as the broker-dealer that executed the UIT purchases.  (*Id.*)

Although MIS profited on the transactional sales charges, Mr. McDermott and MIA did not deduct any of the amounts paid in connection with those charges from their clients' advisory fee.  (*Id.* ¶ 92.)

### 3. The Commission's Examination

In late 2013, the Commission initiated an examination of MIS.  (*Id.* ¶ 134.)  In December 2013, Mark Fowler, the lead examiner, had several discussions with Mr. McDermott regarding MIA's UIT purchasing practices.[2]  (*Id.* ¶ 136.)  Specifically, Mr. Fowler and Mr. McDermott discussed MIA's practice of purchasing higher-cost, standard version UITs rather than lower-cost, fee-based version.  (*Id.* ¶ 137.)  In these discussions, Mr. Fowler informed Mr. McDermott about a then-recent enforcement action, *In re Sarkauskas & Associates, Inc.*, Advisers Act Release No. 3669, 2013 WL 4883131 (Sept. 13, 2013), in which the Commission "found that the investment adviser . . . breached its fiduciary duties . . . by putting its clients in a version of UITs paying a transactional sales charge when a lower-cost share class was available to clients."  (*Id.* ¶¶ 138–40.)  At this point, Mr. Fowler did not inform Mr. McDermott that MIA's UIT purchasing practices may violate the Advisers Act.  (*See* Doc. No. 143 at 100:3–101:6 (Mr. Fowler explaining at trial that the Commission did not make a determination regarding the legality of MIA's UIT purchasing practices until several months following the December 2013 meeting with Mr. McDermott).)

On January 6, 2015, the Commission sent Mr. McDermott a deficiency letter detailing a

---

[2] Although the Commission's examination was of MIS, the Commission considered MIA's UIT purchasing practices in connection therewith.  (*See* Trial Ex. 338.)

handful of potential violations identified through the examination.  (*See* Trial Ex. 338.)  Among

other deficiencies, the letter indicated that MIA's UIT purchasing practices may have been in

violation of FINRA Rule 2111.  (*See id.* at 6 ("It appears that the Firm violated FINRA Rule

2111, by effecting transactions in unit investment trust securities ('UIT') that were unsuitable for

certain customers by charging a sales charge where a more appropriate option of the same

security existed without a sales charge.").)

Mr. McDermott and MIA have not purchased UITs for their clients since receiving the

deficiency letter.  (*See* Doc. No. 142 at 193:20–22 ("Q:  And at that point in time [i.e., upon

receipt of the deficiency letter], you completely stopped putting your clients in UIT's [sic]?

A:  Yes.").)

### *B.*    *Procedural History*

In September 2019, the Commission filed a four-count Complaint against Defendants.

(Doc. No. 1.)  The Commission claimed that Defendants' UIT purchasing practices violated

Sections 206(1) and 206(2) of the Advisers Act.  (*Id.* ¶¶ 36–41.)  They also claimed that

Mr. McDermott violated Section 209 of the Advisers Act by aiding and abetting MIA's

violations.  (*Id.* ¶¶ 42–45.)  And they sought relief against MIS, who they claimed had been

unjustly enriched by the UIT purchasing practices.  (*Id.* ¶¶ 46–49.)

MIS filed a motion to dismiss for failure to state a claim (Doc. No. 13), which the

Honorable Joseph F. Leeson denied (Doc. No. 21).[3]  Upon completion of discovery, the

Commission moved to preclude Defendants' expert, and Defendants moved to preclude the

Commission's experts.  (Docs. No. 48–50.)  The Commission also moved for summary

---

[3] This matter was subsequently reassigned to the calendar of the Honorable Karen Spencer
Marston.  (Doc. No. 26.)

judgment.  (Doc. No. 46).  In March 2022, the Court granted the motions to preclude in part and

denied the motion for summary judgment. (Docs. No. 65–68.)

Following a six-day trial in July 2022, the jury rendered a verdict finding Defendants

liable on all counts.  (Doc. No. 139.)  Because the jury decided only liability and not damages,

the Court ordered briefing on the appropriate remedy in this matter.  (Doc. No. 140.)  On

September 7, 2022, the Commission filed its motion for judgment, requesting that the Court

enter judgment:

> (1)  permanently enjoining MIA and Mr. McDermott from violating
> Sections 206(1) and 206(2) of the Investment Advisers Act of 1940;
>
> (2)  ordering MIA, Mr. McDermott, and MIS, jointly and severally, to
> pay disgorgement of the $143,379.33 that MIS received as a result
> of the avoidable transactional sales charges they unnecessarily made
> MIA advisory clients pay;
>
> (3)  ordering MIA, Mr. McDermott, and MIS, jointly and severally, to
> pay prejudgment interest on that amount of $50,983.60; and
>
> (4)  ordering MIA and Mr. McDermott to pay civil penalties,
> respectively, in the amounts of $400,000 and $80,000.

(*See* Doc. No. 149 at 1.)  The Commission contends "[t]he relief sought is necessary and

appropriate to redress Defendants' violations of the securities laws, and to compensate

Defendants' advisory clients harmed by their conduct."  (*Id.* at 2.)

Defendants and Relief Defendant oppose the motion.  (Doc. No. 152.)  They argue that

the Commission's requested remedies are far too harsh given Defendants' violations.  (*Id.* at 10.)

Defendants ask the court to deny the Commission's request for injunctive relief, cap any

disgorgement award at $84,182, deny the Commission's request for prejudgment interest, and

deny the Commission's request for the maximum second tier civil penalty.  (*Id.*)

The Court held oral argument on the motion on October 26, 2022.  (Doc. No. 140.)

## II.     ANALYSIS

The Court considers the propriety of each of the requested forms of relief in turn.

### A.     *Permanent Injunction*

First, the Commission asks that the Court permanently enjoin MIA and Mr. McDermott from violating Sections 206(1) and 206(2) of the Advisers Act.  (Doc. No. 149-1 at 5.)  The Advisers Act permits a court to permanently enjoin a defendant from engaging in any acts or practices that violate the Advisers Act "upon a showing that such person has engaged, is engaged, or is about to engage in any . . . act or practice constituting a violation of [the Act]."  15 U.S.C. § 80b-9(d).  In determining whether to issue an injunction, courts consider a number of factors, including the following:

> the degree of scienter involved on the part of the defendant, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, the sincerity of his assurances against future violations, and the likelihood, because of defendant's professional occupation, that future violations might occur.

*Sec. & Exch. Comm'n v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980).  "Essentially, a court makes a prediction of the likelihood of future violations based on an assessment of the totality of the circumstances surrounding the particular defendant and the past violations that were committed." *Id.*

Courts also must assess "all those considerations of fairness that have been the traditional concern of equity courts," including "the adverse effect of an injunction upon defendants."  *See Sec. & Exch. Comm'n v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972).  "Those considerations include not only the need to protect the public where the circumstances of the offense and of the offender give rise to a substantial risk of future harm, but also the stigma, humiliation, and loss of livelihood attendant to the imposition of [an] injunction[]."  *Sec. & Exch.*

7

*Comm'n v. Gentile*, 939 F.3d 549, 559 (3d Cir. 2019).  In short, injunctions are <u>not</u> intended to punish defendants for past wrongdoing; they are intended to prevent future violations.  *Id.* ("Nothing . . . suggests Congress meant to depart from the rule that injunctions are issued to prevent harm rather than to punish past wrongdoing.  Neither provision mentions retribution or general deterrence.").

The Commission contends that the requested injunctions are warranted because Defendants continue to act as investment advisers and, unless enjoined, are likely to violate the Advisers Act again.  (Doc. No. 149-1 at 9.)  Defendants argue that injunctive relief is "unnecessary and impermissibly punitive," as there is not a substantial likelihood that Defendants will violate the securities laws in the future and an injunction would be a death knell for Mr. McDermott's career.  (Doc. No. 152 at 12–13.)  Defendants also contend that certain of their clients would be harmed by the entry of an injunction, as they would be forced to find a new adviser.  (*Id.*)

The Court considers the relevant factors in determining whether to grant the Commission's request for injunctive relief in turn below.

*Degree of Scienter.*  In finding that Defendants violated Section 206(1), the jury found that Defendants acted with scienter.  (*See* Doc. No. 139 at 2 (finding that Mr. McDermott "knowingly or recklessly failed to act in his clients' best interest, seek best execution, or disclose a conflict of interest"); *see also id.* (finding that MIA "knowingly or recklessly failed to act in his clients' best interest, seek best execution, or disclose a conflict of interest"); Doc. No. 152 at 16 ("Defendants acknowledge the jury concluded MIA and Mr. McDermott acted with scienter . . . .").)  The jury's finding that both Defendants acted with scienter supports the Commission's request for injunctive relief.  *See Sec. & Exch. Comm'n v. Ambassador Advisors, LLC*, Civil No.

8

5:20-cv-02274-JMG, 2022 WL 4097327, at *3–4 (E.D. Pa. Sept. 7, 2022) (explaining that the

fact the defendants acted with scienter "weigh[s] in favor of a permanent injunction"); *Sec. &*

*Exch. Comm'n v. Westport Capital Mkts., LLC*, 547 F. Supp. 3d 157, 166 (D. Conn. 2021)

(finding that the jury's verdict, which established that the defendants acted with scienter,

weighed "in favor of a finding of a reasonable likelihood of future violations").

     *Isolated or Recurrent Nature of the Infraction.*  From March 2013 through December

2014, Defendants purchased 403 UITs on behalf of 166 advisory clients.  (Doc. No. 104, Att. B

¶¶ 76–77.)  Although Defendants have since stopped purchasing UITs, the conduct identified in

the complaint, which occurred on 403 instances over the course of nearly two years, can in no

way be described as "isolated," and this factor also weighs in favor of injunctive relief.  *See*

*Ambassador Advisors*, 2022 WL 4097327, at *4 (finding the defendants' conduct recurrent

where they engaged in it "repeatedly, for thousands of clients, over the course of almost four-

and-a-half years"); *Westport Capital*, 547 F. Supp. 3d at 166 (finding the defendants engaged in

recurrent conduct where they "engaged in conflicted selling dealer and 12b-1 fee transactions for

several years and . . . earned hundreds of thousands of dollars from doing so").

     *Defendants' Recognition of the Wrongful Nature of Their Conduct.*  Although Defendants

notified their clients of the jury's verdict, the notice stated that they continue to maintain that

they "believe the UIT purchases were in [their] advisory clients' best interest when viewed in the

context of the comprehensive fee structure and the advisory relationship as a whole."  (Doc. No.

152-3 at 3.)  Defendants' assertion that they believed they acted in their clients' best interest, but

the jury thought otherwise, is, at most, a partial recognition of the wrongful nature of their

conduct.  It cannot be said that Defendants have earnestly acknowledged the wrongful nature of

their conduct.  The Court finds that because Defendants have not fully acknowledged the

wrongful nature of their conduct, this factor weighs slightly in favor of an injunction.  *Cf.*

*Ambassador Advisors*, 2022 WL 4097327, at *7 (finding that the defendants failed to

acknowledge the wrongful nature of their conduct where the defendants "released a video and

statement declaring that their 'clients were never overcharged, nor were gains or returns

compromised in any way,'" which was inconsistent with the jury's verdict).

        *Likelihood of Future Violations.*  Although both Defendants are still acting as investment

advisers, the Court finds it very unlikely that either Defendant will violate the Advisers Act in

the future.  This is driven in large part by the fact that Defendants stopped purchasing UITs

***immediately*** upon receipt of the Commission's deficiency letter and have not purchased any

UITs or violated any securities laws since.  *See Ambassador Advisors*, 2022 WL 4097327, at *4

(finding "adequate assurances" that the defendants would not repeat their violations in part

because they "no longer purchase 12b-1 fee bearing mutual funds"); *Westport Capital*, 547 F.

Supp. 3d at 166 (finding it unlikely that the defendants would engage in future violations of the

securities laws where, among other things, the defendants "discontinued the principal

transactions in July 2015").

        Although Defendants stopped purchasing UITs immediately upon receipt of the

Commission's deficiency letter and have not purchased any UITs or engaged in any securities

violations in the seven years since, the Commission offers several arguments why Defendants are

likely to violate the securities laws in the future.  The Court is not persuaded by these arguments.

        First, the Commission argues that Defendants are likely to violate the securities laws in

the future because Mr. McDermott and MIA are still investment advisers.  But the simple fact

that Defendants continue to function as investment advisers does not, on its own, necessitate a

finding that Defendants are likely to violate the securities laws in the future.  If the fact of a

violator's continued involvement in the investment advisory industry were enough for a court to assume the violator would engage in future violations, the exception would swallow the rule, and courts would be inclined to enter an injunction against almost everyone who violated the Advisers Act and wanted to stay in the industry. *See Ambassador Advisors*, 2022 WL 4097327, at \*4 (declining to enter injunctive relief even though certain of the defendants were continuing to operate as investment advisers); *Westport Capital*, 547 F. Supp. 3d at 166 (same).

The Commission also suggests that Mr. McDermott is especially likely to violate securities laws in the future because he is a recidivist offender. (Doc. No. 149-1 at 13.) In 1998, Mr. McDermott entered into a settlement agreement with the Commission "related to allegations that [he] and others had ignored red flags regarding certain investments into bond trading vehicles promoted by a third party that turned out to be fraudulent." (Doc. No. 86 at 2.) The Court is not persuaded by this argument—the fact that Mr. McDermott entered into this settlement agreement nearly 25 years ago does not make it more likely that he will engage in securities law violations in the future. As an initial matter, Mr. McDermott never admitted to the alleged conduct and the Commission never proved its allegations. *See In re McDermott et al.*, SEC Release No. 7502 (Jan. 30, 1998), https://www.sec.gov/litigation/admin/337502.txt. Rather, Mr. McDermott submitted an offer of settlement "[s]olely for the purpose of these proceedings . . . without admitting or denying the findings contained [in the Release]." *Id.* at 1. Moreover, the conduct at issue in the 1998 settlement is of an entirely different nature than the conduct alleged in this action. That settlement dealt with allegations that Mr. McDermott failed to adequately investigate red flags in an investment opportunity that turned out to be a Ponzi scheme. Mr. McDermott was not alleged to have been involved in the Ponzi scheme—he merely failed to look closely at the investment opportunity. The fact that nearly 25 years ago

11

Mr. McDermott entered into a settlement agreement regarding allegedly deficient due diligence processes does not suggest to the Court that he is likely to violate securities laws in the future, especially given that the Commission has not accused Mr. McDermott of any securities law violations since Defendants stopped purchasing UITs at the end of 2014.

Next, in its briefing and at oral argument, the Commission strenuously argues that Defendants are likely to violate the securities laws in the future because they continue to represent to their clients that Mr. McDermott obtained a "fake" Ph.D. from LaSalle University. (Doc. No. 149-1 at 13.)  As discussed in greater detail in the Court's Memorandum on the motions *in limine*, Mr. McDermott obtained a Ph.D. from LaSalle University, an unaccredited university in Mandeville, Louisiana.  (*See* Doc. No. 118 at 9–14.)  Mr. McDermott did not complete any coursework in connection with the Ph.D. program but engaged in telephonic conferences with advisors and authored and defended a dissertation.  Shortly after Mr. McDermott earned his Ph.D., LaSalle University was found to be a diploma mill, its founder was charged with fraud, and students were offered a tuition refund.  Although Mr. McDermott accepted a refund, he continues to describe himself as having a Ph.D. from LaSalle University. The Commission argues this "uncharged conduct" is misleading, as Mr. McDermott does not have a Ph.D. from LaSalle University (an accredited university in the greater-Philadelphia area) but only has a "Ph.D." (for which he received a refund) from LaSalle University–Mandeville (which has since been shut down).  Although the Court agrees that it may be wise for Mr. McDermott to remove references to his "Ph.D." from MIA's website and marketing materials, the Court does not find the fact Mr. McDermott continues to tout his Ph.D. makes it more likely that he will violate securities laws in the future.[4]

---

[4] The Court thinks it especially advisable for Mr. McDermott to remove references to his Ph.D. from MIA's materials given the Commission's position at oral argument that this is "uncharged conduct"

In sum, despite the Commission's arguments otherwise, it seems very unlikely to the Court that either Defendant will violate any securities laws in the future. Crucially, Defendants have not engaged in the UIT purchasing practices at issue in this action since the Commission informed Defendants their practices may be problematic, and neither Defendant has committed any other securities law violation in the intervening seven years. Plus, Defendants have provided assurances that they will not commit any securities law violations in the future, as "this experience has been extraordinarily time consuming, and emotionally and financially draining." (Doc. No. 152 at 18.) Based on these assurances and the Court's finding that Defendants are unlikely to violate the securities laws in the future, this factor weighs heavily against an injunction.

*Adverse Effect of an Injunction Upon Defendants.* Finally, both Defendants would suffer profoundly adverse effects were the Court to enter an injunction. Both Mr. McDermott and MIA are registered investment advisers, and the Commission would likely initiate proceedings to bar both Defendants from the investment advisory industry were the Court to issue an injunction. *See* 15 U.S.C. § 80b-3(f). This would obviously be hugely detrimental, as MIA would be forced to close its doors and Mr. McDermott would not be able to continue working in the field in which he has worked for decades. Indeed, "when a court bans a defendant from his industry, it imposes what in the administrative context has been called the 'securities industry equivalent of capital punishment.'" *Gentile*, 939 F.3d at 566 (quoting *Saad v. Sec. & Exch. Comm'n*, 718 F.3d 904, 906 (D.C. Cir. 2013)).

In addition to the professional and financial consequences attendant to such proceedings, Mr. McDermott would also face great personal reputational consequences beyond those he has

---

which could potentially be the basis of a securities violation.

already suffered.  Accordingly, this factor weighs against injunctive relief.  *See Ambassador Advisors*, 2022 WL 4097327, at *4 (finding that this factor weighed against injunctive relief where "a permanent injunction would have severe professional consequences for Defendants"); *Westport Capital*, 547 F. Supp. 3d at 166 ("Here, the impact on [the defendant] would be severe because it would facilitate administrative sanctions that would very likely end [the defendant's] career.").

Defendants are not the only ones who would suffer were the Court to enter an injunction—injunctive relief would also negatively affect certain of Defendants' clients. Defendants have 314 advisory clients, and if the Court were to enter an injunction and the Commission were able to bar them from the investment advisory industry, those clients would be forced to retain a new adviser or manage their own accounts.  Indeed, Defendants offered letters of support from ten clients explaining their relationship with Mr. McDermott and, in no uncertain terms, opposing an injunction.[5]  (*See* Docs. No. 152-4–152-13.)  Three of Defendants' clients offered testimony to the same effect at the Court's hearing on October 26.

*     *     *

Considering these factors together, the Court finds that injunctive relief is not warranted. Defendants did not engage in the kind of egregious, continuing conduct typically present when courts enter injunctive relief.  Although Defendants acted with scienter and repeatedly purchased UITs, they stopped doing so as soon as the Commission warned there may be issues with the practice, and neither Defendant has purchased UITs for advisory clients or engaged in any other securities law violations since.  Plus, both Defendants would suffer detrimental personal and

---

[5] The Court notes, however, that the persuasive value of these letters is tempered by the fact that many of these clients consider themselves friends of Mr. McDermott, and the Court does not rely on this evidence in making its decision as to whether or not to issue an injunction.

14

professional consequences were the Court to enter an injunction.

The purpose of injunctive relief is not to punish but to prevent future violations of the securities laws. Because the Court finds it quite unlikely that Defendants would violate the securities laws going forward, injunctive relief is not warranted as to either Defendant. *See Ambassador Advisors*, 2022 WL 4097327, at \*5 (declining to enter an injunction even though the defendants acted with scienter and engaged in recurring wrongful conduct because there was "little chance" the defendants would engage in the "business practices that gave rise to th[e] suit" and an injunction would cause the defendants severe consequences); *Westport Capital*, 547 F. Supp. 3d at 166 (finding there was not a reasonable likelihood the defendants would commit future security law violations and declining to enter an injunction even though the defendants acted with scienter and engaged in repeated wrongful transactions where the defendants discontinued the wrongful practices, had not engaged in any additional violations, and recognized that they engaged in wrongful conduct). *Contra Sec. & Exch. Comm'n v. Good*, No. 7:22-CV-60-D, 2022 WL 1485177, at \*1 (E.D.N.C. Apr. 20, 2022) (entering an injunction where the defendant "ran a multi-year Ponzi scheme in order to live a lavish lifestyle and defrauded at least five investors out of millions of dollars" and continued to engage in the wrongful conduct); *Sec. & Exch. Comm'n v. Genovese*, 553 F. Supp. 3d 24, 45 (S.D.N.Y. 2021) (entering a permanent injunction where the defendant had pleaded guilty to fraud in a parallel criminal proceeding and the sentencing judge found that he was "truly a predator, unlike any [the judge had] encountered in more than 21 years on the bench").

### B.    *Disgorgement*

Next, the Commission seeks disgorgement of the $143,379.33 "that MIS received as a result of the avoidable transactional sales charges they unnecessarily made MIA advisory clients

pay." (Doc. No. 149-1 at 5.) Courts may order disgorgement of gains wrongly gotten through violations of the Advisers Act. *See* 15 U.S.C. § 78u(d)(7). The disgorgement remedy serves two purposes: "to deprive a wrongdoer of his unjust enrichment and to deter others from violating securities laws." *See Sec. & Exch. Comm'n v. Teo*, 746 F.3d 90, 104–05 (3d Cir. 2014). "[D]isgorgement may not be used punitively." *See Sec. & Exch. Comm'n v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989).

"Since disgorgement primarily serves to prevent unjust enrichment, the court may exercise its equitable power only over property causally related to the wrongdoing." *Id.* Courts employ a burden shifting approach to ascertain the amount "causally related to the wrongdoing." *See Teo*, 746 F.3d at 105. The initial burden rests with the Commission, which must "produce evidence supporting a reasonable approximation of 'actual profits on the tainted transactions.'" *Id.* (quoting *First City Fin. Corp.*, 890 F.2d at 1231). Once the Commission has made the initial showing, the burden shifts to the defendants to "demonstrate that the disgorgement figure is not a reasonable approximation." *Id.* (cleaned up). The Commission's approximation need not be exact—"the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty." *Id.* A disgorgement award cannot exceed net profits "made upon [the] business or investment, when both the receipts and payments are taken into account." *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 145 (2020).[6]

The Commission has calculated that MIS earned $143,379.33 in net profits through the fraudulent UIT purchasing practices, all of which should be disgorged. (Doc. No. 149-1 at 18.)

---

[6] It is not clear whether *Liu*'s limitations apply to disgorgement sought under 15 U.S.C. § 78u(d)(7), which was codified *after* the Supreme Court's decision in *Liu*. Neither party expressly suggests *Liu*'s limitations do not apply to disgorgement sought under § 78u(d)(7), so, for the purposes of this Memorandum, the Court assumes *Liu*'s limits apply to the disgorgement sought here.

This represents the transactional sales charges that Defendants' clients paid ($159,592.18) less the portion of those charges that flowed directly to the UIT sponsor (-$16,212.85). (*Id.*) Defendants concede that some disgorgement is appropriate in the light of the jury's verdict, but they contend that the Commission's request is far too high, as it does not account for expenses MIS incurred in connection with UIT purchases or any portion of MIS's overhead expenses. (Doc. No. 152 at 24.) Specifically, Defendants ask the Court to reduce the disgorgement award by the amount MIS expended on ticket charges, commissions, and a portion of overhead expenses.

The Court declines to deduct any of these amounts from the disgorgement award. We decline to deduct the ticket charges because MIS would have incurred the same ticket charges regardless of whether Defendants had purchased standard or fee-based UITs. In *Liu*, the Supreme Court explained that a defendant is entitled to a deduction only of those "marginal costs incurred in producing the revenues that are subject to disgorgement." *Liu*, 140 S. Ct. at 1950. Because MIS would have incurred the ticket charges regardless of the type of UIT purchased, these charges cannot be considered a "marginal cost incurred in producing the revenues" on the transactional sales charges, so they need not be deducted from the disgorgement award.

The same logic applies to the overhead expenses. At oral argument, Defendants' expert confirmed that MIS would have incurred roughly the same overhead expenses had Defendants purchased the fee-based, rather than standard, UITs. Accordingly, the overhead expenses are not a "marginal cost" MIS incurred in collecting transactional sales charges on the standard-version UITs, so no share of overhead expenses will be deducted from the disgorgement award.

As for the commissions, MIS was contractually obligated to pay commission on every standard-version UIT sold. The commissions were a percentage of the transactional sales charge

MIS received on those UITs.  MIS did not pay commission on fee-based UITs.[7]  Defendants contend that because they were contractually required to pay a percentage of the transactional sales charges received as commission, they essentially never earned that portion of the profit and the commissions cannot be considered in the disgorgement award.  (Doc. No. 152 at 24.)  The Court is not persuaded by this argument.  MIS actually received the full $143,379.33 in transactional sales charges the Commission seeks to disgorge.  The fact that MIS, pursuant to its contractual obligations, distributed a percentage of those charges to sales representatives *after* it pocketed the charges does not change this fact.  MIS took in the profits, so it is responsible for disgorging them, even though it subsequently sent a portion of the profits away in commissions. *See Sec. & Exch. Comm'n v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010) ("A person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained.").

The Court declines to deduct any expenses from the Commission's requested disgorgement award and will enter an award in the amount of $143,379.33, representing the full amount of transactional sales charges MIS received on the fraudulent UIT purchases.

Having determined that we will enter a disgorgement award against MIS, the Court must now determine whether to hold MIA and Mr. McDermott jointly and severally liable for that award.  Defendants oppose the Commission's request to hold MIA and Mr. McDermott jointly and severally liable, as neither MIA nor Mr. McDermott earned any revenue on the UIT sales charges.  (Doc. No. 152 at 8.)

In *Liu*, the Supreme Court noted that a wrongdoer typically may not be held jointly and

---

[7] At oral argument, Defendants' counsel explained that MIS did not pay commission on fee-based UITs, as the representatives who sold fee-based UITs were compensated through their advisory fees.

severally liable for benefits that accrue to his affiliates. *Liu*, 140 S. Ct. at 1949. However, the Court acknowledged that joint and several liability may be appropriate "for partners engaged in concerted wrongdoing." *Id.*

The Court finds that it is appropriate to hold both MIA and Mr. McDermott jointly and severally liable for the disgorgement award against MIS as "partners engaged in concerted wrongdoing." Mr. McDermott is the sole owner and managing member of both MIA and MIS. (Doc. No. 104, Att. B ¶ 1.) Mr. McDermott alone made the decisions regarding investments in MIA client accounts (*id.* ¶ 74), and Mr. McDermott (and, in turn, MIA) knew that MIS would receive a substantial share of any transactional sales charges incurred on UIT purchases by MIA clients (*id.* ¶ 90). Because Mr. McDermott is the sole owner of MIS, the Court cannot find that Mr. McDermott did not benefit from the transactional sales charges. And although MIA did not directly receive any of the transactional sales charges, it directed the purchases of higher-priced UITs, thereby enabling MIS to take in over $143,000 in charges. Given Mr. McDermott's control over both MIS and MIA and the fact that Mr. McDermott directed MIA's UIT purchasing practices in a way he knew would benefit MIS, the Court finds that all three entities were "partners engaged in concerted wrongdoing" and can be held jointly and severally liable for the disgorgement award. *See U.S. Sec. & Exch. Comm'n v. Johnson*, 43 F. 4th 382, 390–91 (4th Cir. 2022) (affirming the district court's decision that the individual defendant and the firm he controlled were "partners engaged in concerted wrongdoing" in large part because the defendant controlled the firm's conduct).

In conclusion, MIS, MIA, and Mr. McDermott are jointly and severally liable for disgorgement in the amount of $143,379.33.

### C.      *Prejudgment Interest*

The Commission also seeks prejudgment interest in the amount of $50,983.60.  (Doc. No.

149-1 at 5.)  "It is within the District Court's equitable discretion to decide whether payment of

interest should be ordered, and to decide upon both the interest rate and the period of time on

which the interest will be calculated."  *Teo*, 746 F.3d at 109 (citing *Sec. & Exch. Comm'n v. First*

*Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996)).  In determining the propriety of

prejudgment interest, courts must consider:  "(i) the need to fully compensate the wronged party

for actual damages suffered, (ii) . . . fairness and the relative equities of the award, (iii) the

remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed

relevant by the court."  *Sec. & Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d

Cir. 1996).

On consideration of each of these factors, the Court finds it appropriate to order

prejudgment interest on the disgorgement award.  As to the first factor, prejudgment interest is

necessary to fully compensate Defendants' advisory clients.  Defendants incurred these

transactional sales charges on their clients' accounts in 2013 and 2014, and almost all of the

charges eventually flowed to MIS.  That money—over $143,000—which rightly belongs to

Defendants' advisory clients, has been with MIS for nearly a decade.  These clients have

essentially given MIS an interest-free loan, and they cannot be made whole unless they receive

prejudgment interest.  *See William A. Graham Co. v. Haughey*, 646 F.3d 138, 145 (3d Cir. 2011)

("Requiring only that a losing defendant pay back the principal amount of a wrongfully obtained

sum permits him to retain the money's time-value as a windfall in the form of an interest-free

loan.").  For this same reason, considerations of fairness and the relative equities also support an

award of prejudgment interest.  And the remedial purpose of the Advisers Act—i.e., to protect

20

investors from fraudulent investment advisers—is served by the imposition of prejudgment interest. *See Ambassador Advisors,* 2022 WL 4097327, at *7 ("[B]ecause Defendants' 12b-1 scheme deprived their clients of the opportunity to invest the money they paid in 12b-1 fees and because these fees essentially operated as an interest-free loan to Defendants, the Court also finds it appropriate to award prejudgment interest calculated at the Internal Revenue Service's underpayment rate.").

Defendants ask the Court to exercise its discretion not to award prejudgment interest because MIA clients received "substantial economic benefits" from MIS, purportedly in exchange for MIA clients purchasing the more expensive, standard version UITs. (Doc. No. 152 at 25.) For instance, MIS offered MIA clients commission-free equity trades. (*Id.*) Defendants contend that because MIS bore these costs for MIA's clients, and because the UITs purchased were ultimately profitable for MIA's clients, the Court should not award prejudgment interest. (*Id.*) The Court is not persuaded by Defendants' arguments. MIS offered these "substantial economic benefits" to all MIA clients, not just those whose accounts purchased standard-version UITs. Moreover, even assuming the UITs were profitable for these clients, Defendants could have purchased *the exact same UITs* that did not carry a transactional sales charge, so Defendants' clients could have realized the same success at a lower price.

Accordingly, the Court awards prejudgment interest in the amount of the Internal Revenue Service ("IRS") underpayment rate on the disgorgement award.[8]

---

[8] Courts regularly impose prejudgment interest at the IRS underpayment rate in enforcement actions brought by the Commission, *see, e.g.*, *First Jersey Sec.*, 101 F.3d at 1476; *Ambassador Advisors,* 2022 WL 4097327, at *7; *Westport Capital*, 547 F. Supp. 3d at 171, and Defendants do not take issue with the rate.

### D.   *Civil Penalties*

Last, the Commission asks the Court to order MIA and Mr. McDermott to pay civil

penalties in the amounts of $400,000 and $80,000, respectively.  (Doc. No. 149-1 at 6.)  Courts

may impose civil penalties upon any individual or entity who has violated the Advisers Act.  *See*

15 U.S.C. § 80b-9(e).  A court may impose "first tier" penalties against an individual or entity

who violates the Advisers Act.  *Id.* § 80b-9(e)(2).  First tier penalties are to be determined "by

the court in light of the facts and circumstances"; however, a first tier penalty may not exceed

either $9,484 for an individual or $94,847 for an entity *or* the amount of pecuniary gain incurred

by that defendant as a result of the violation.  *Id.* § 80b-9(e)(2)(A); 17 C.F.R. § 201.1001(b).

Where a violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a

regulatory requirement," a court may impost "second tier" penalties.  15 U.S.C. § 80b-

9(e)(2)(B).  A second tier penalty may not exceed either $94,847 for an individual or $474,233

for an entity.  *Id.*; 17 C.F.R. § 201.1001(b).

In determining the appropriate civil penalties, courts consider the facts and circumstances

of the violation and weigh the following factors:

> (1) the egregiousness of the violations; (2) the defendant's scienter;
> (3) the repeated nature of the violations; (4) the defendant's failure
> to admit to his wrongdoing; (5) whether the defendant's misconduct
> created substantial losses or the risk of substantial losses to others;
> and (6) the defendant's lack of cooperation and honesty with
> authorities.

*See Sec. & Exch. Comm'n v. Zvodihikov*, Civil Action No. 16-845, 2020 WL 634184, at *6

(D.N.J. Feb. 10, 2020); *see also Sec. & Exch. Comm'n v. Lazare Indus.*, 294 F. App'x 711, 715

(3d Cir. 2008).

The Commission seeks the statutory maximum second tier penalties against both

Defendants.  (Doc. No. 149-1 at 23.)  Defendants agree that a second tier penalty may be

warranted in this matter given the jury's verdict, but they argue that the Commission's request for the maximum second tier penalty is "grossly disproportionate to the gravity of the offenses." (Doc. No. 152 at 26–27.)

Although the Court agrees with the Commission that some penalties are warranted, the Court finds the Commission's requested penalties unnecessarily steep, especially in light of the relatively small amount misappropriated through Defendants' UIT purchasing practices.

The first and second factors clearly support the imposition of the maximum penalty. Defendants' violations were egregious—they caused their clients to incur unnecessary charges, which indirectly benefitted an affiliated entity, and did not receive their clients' consent to engage in these conflicted transactions.  Investment advisers are fiduciaries, and this conduct violates the very core of their duties to clients.  The jury also found that Defendants acted with scienter in committing these violations.

The remaining factors are more neutral and support the imposition of a penalty, but a lesser penalty.  Defendants purchased more expensive UITs for their advisory clients more than one hundred times over a two-year period; however, this is tempered by the fact that Defendants stopped purchasing UITs immediately upon receipt of the Commission's deficiency letter and have not purchased UITs since.  And as discussed above, although Defendants have not taken full-throated responsibility for their wrongdoing, they have acknowledged the jury verdict, stating that the jury found that "Mr. McDermott and MIA intentionally 'failed to act in [their] clients' best interest, seek best execution or disclose a conflict of interest,' in breach of their fiduciary duty and in violation of Section 206(1) of the Advisors Act."  (*See* Doc. No. 152-3 at 3.)

Moreover, although Defendants litigated this case, they acted in good faith over the

23

course of the litigation, including by producing a trove of documents in discovery, making their employees available for depositions and in-court testimony, and stipulating to hundreds of facts, including to the amount of transactional sales charges incurred, which streamlined trial.  (*See generally* Doc. No. 104, Att. B.)

Finally, and perhaps most importantly, Defendants' violations caused their clients to suffer losses that are relatively minor compared to the penalties sought.  In all, Defendants' UIT purchasing practices caused their clients to incur less than $160,000 in needless transactional sales charges, but the Commission seeks nearly three times as much in penalties.

Considering the facts and circumstances of Defendants' violations, the Court agrees that a penalty is warranted but finds that it would be unduly harsh to impose the statutory maximum penalty.  Were the Court to grant the Commission's request for the statutory maximum penalties, we would be imposing a total of $480,000 in penalties against Mr. McDermott and MIA even though their violations caused their clients to incur only $159,592.18 in transactional sales charges.  This represents nearly a 3:1 ratio, which is atypically high—courts typically award penalties on a lower ratio.  *See, e.g.*, *Ambassador Advisors,* 2022 WL 4097327, at *9 (ordering civil penalties reflecting a 2:1 ratio of the amount disgorged); *Westport Capital*, 547 F. Supp. 3d at 175 (ordering disgorgement in the amount of $632,954 and third tier civil penalties in the amount of $500,000).

The Court believes that a 1:1 ratio is appropriate here; accordingly, the Court will order civil penalties against MIA in the amount of $110,000 and against Mr. McDermott in the amount of $50,000.  This yields a total of $160,000 in civil penalties against both Defendants, which represents a roughly 1:1 ratio relative to the total amount Defendants' clients needlessly

expended on transactional sales charges.[9]  This approach strikes a balance between competing circumstances surrounding the violations.  Awarding less than the statutory maximum reflects the (relatively) limited harm Defendants' clients suffered.  But on the other hand, awarding more than Defendants request (and more than the statutory maximum first tier penalty) accounts for the fact that Defendants committed these violations with scienter.

## III.   CONCLUSION

For the reasons above, the Commission's motion is granted in part.  The Court will not enter a permanent injunction against Defendants; however, the Court will order disgorgement, prejudgment interest, and civil penalties in the amounts detailed below:

- *Disgorgement.*  MIS, MIA, and Mr. McDermott are jointly and severally liable for disgorgement in the amount of $143,379.33.

- *Prejudgment Interest.*  MIS, MIA, and Mr. McDermott are jointly and severally liable for prejudgment interest in the amount of $50,983.60.

- *Civil Penalties.*  MIS is liable for $110,000 in civil penalties.  Mr. McDermott is liable for $50,000 in civil penalties.

---

[9] Defendants suggest that any civil penalties should be tied to the disgorgement amount rather than the amount that Defendants' clients actually paid.  The Court declines to adopt this approach, as our analysis of the facts and circumstances of the violations support the imposition of slightly higher penalties.